William I. Edlund, State Bar No. 25013
Alyson L. Huber, State Bar No. 202713
BARTKO, ZANKEL, TARRANT & MILLER
A Professional Corporation
900 Front Street, Suite 300
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152
wedlund@bztm.com
ahuber@bztm.com

Michael L. Rosen, *Admitted Pro Hac Vice*
John E. Duke, *Admitted Pro Hac Vice*
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mrosen@foleyhoag.com
jduke@foleyhoag.com

Attorneys for Defendant Power Medical Interventions

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MYRICK TANTIADO, an individual,<br><br>    Plaintiff,<br><br>        v.<br><br>POWER MEDICAL INTERVENTIONS, a Pennsylvania corporation, and DOES ONE through FIFTY, inclusive,<br><br>    Defendants. | Case No. C 07-02874 CRB<br><br>**DEFENDANT POWER MEDICAL INTERVENTIONS, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: September 5, 2008<br>Time:        10:00 a.m.<br>Judge:       Hon. Charles R. Breyer<br>Courtroom:  8 |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 5, 2008, at 10:00 a.m., or as soon thereafter as

counsel can be heard, in Courtroom No. 8 of the above-entitled Court, located at 450 Golden Gate

- 1 -

1  Avenue, San Francisco, California, before the Honorable Charles R. Breyer, defendant Power

2  Medical Interventions ("PMI") will and hereby does move the Court pursuant to Rule 56(c) of the

3  Federal Rules of Civil Procedure for partial summary judgment for PMI and against plaintiff

4  Myrick Tantiado ("Tantiado") on Count I ( wrongful termination in violation of public policy) and

5  the portion of Count II alleging that PMI unlawfully failed to reimburse Tantiado for expenses he

6  incurred during his employment with PMI.

7       The grounds for said motion are that there is no triable issue of material fact as to

8  Tantiado's wrongful discharge in violation of public policy and expense reimbursement claims

9  against PMI, and that PMI is thus entitled to partial summary judgment against Tantiado on these

10  claims as a matter of law.

11       This motion is based upon this Notice of Motion and Motion, the accompanying

12  Memorandum of Points and Authorities, and Declarations of Michael Whitman, Pat Steffan, Rita

13  Esposito, and John E. Duke in support, all served and filed concurrently herewith, all pleadings

14  and papers on file in this action, and such other evidence and argument as may be presented to the

15  Court before and at the time of the hearing on the motion.

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

**TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ....................................1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ............................2

III.   ARGUMENT..................................................................................8

    A.    Tantiado's Wrongful Discharge Claim Fails As A Matter Of
        Law. ................................................................................8

        1.    Tantiado Cannot Establish A *Prima Facie* Case. ......................9

                a.    Tantiado Did Not Engage In Protected
                    Activity. ........................................................9

                b.    There Is No Evidence Linking Whitman's
                    Termination Decision To Tantiado's
                    "Complaint". ....................................................11

        2.    PMI Terminated Tantiado For A Legitimate Reason. ...............13

        3.    Tantiado Cannot Show That PMI's Legitimate
            Reason Is Pretext. ................................................13

    B.    PMI Reimbursed Tantiado For All Expenses To Which He Is
        Entitled.............................................................................14

        1.    Tantiado Was Fully Reimbursed. ..................................15

        2.    Accepting His Allegations As True, Tantiado Was
            Not Entitled To Have His Expenses Reimbursed. ....................17

IV.    CONCLUSION.................................................................................17

1

## **TABLE OF AUTHORITIES**

2

### **CASES**

3

*Adams v. Kmart Corp.*, No. C 00-03885, 2001 U.S. Dist. LEXIS 12827 (N.D. Cal. Aug. 10, 2001) ........................................................................................................12

*Anderson v. Union Pac. R.R. Co.*, No. S-06-2813, 2008 U.S. Dist. LEXIS 41776 (E.D. Cal. May 20, 2008) ..................................................................................................9

*Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654 (9th Cir. 2002).............................14

*Benhabib v. Hughes Elecs. Corp.*, No. 04-0095, 2007 U.S. Dist. LEXIS 87500 (C.D. Cal. Mar. 30, 2007).....................................................................................................9

*Cocchi v. Circuit City Stores, Inc.*, No. C-05-1347, 2006 U.S. Dist. LEXIS 20126 (N.D. Cal. Apr. 3, 2006) ...............................................................................................11

*Esberg v. Union Oil Co.*, 28 Cal. 4th 262 (2002) ........................................................10

*Gantt v. Sentry Ins.*, 1 Cal. 4th 1083 (1992) ...................................................................9

*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (2007).....................................16

*Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66 (1998)........................................................9, 10

*Hoy v. Sears, Roebuck & Co.*, 861 F. Supp. 881 (N.D. Cal. 1994) ...............................13

*Jhingan v. Roche Molecular Systems*, No. C 94-3176, 1996 WL 466577 (N.D. Cal. May 13, 1996) .........................................................................................................11

*Knights v. Hewlett Packard*, 230 Cal. App. 3d 775 (1991) ...........................................13

*Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313 (2006)........................................15, 17

*Martin v. Lockheed Missiles & Space Co.*, 29 Cal. App. 4th 1718 (1994).....................14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...............................................9

*Moore v. May Dept. Stores Co.*, 222 Cal. App. 3d 836 (1990) ......................................13

*Morelewicz v. GEICO*, No. 04-56358, 2006 U.S. Dist. LEXIS 28638 (9th Cir. Nov. 17, 2006)............................................................................................................10

*Sequoia Ins. Co. v. Superior Court*, 13 Cal. App. 4th 1472 (1993)........................10, 11

*Steinhebel v. Los Angeles Times Communications*, 126 Cal. App. 4th 696 (2005)...............15, 17

*Stiesberg v. California*, 80 F.3d 353 (9th Cir. 1996) ......................................................11

### **STATUTES**

21 U.S.C. § 351.......................................................................................2, 6, 11, 17

Cal. Lab. Code § 221 ..............................................................................................15

Cal. Lab. Code § 2802 ...................................................................................2, 16, 17

Cal. Lab. Code § 2922 ...............................................................................................9

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Myrick Tantiado is a former at-will sales employee of defendant Power Medical Interventions, Inc. ("PMI") who believes it violates public policy to discharge a sales employee for having poor sales numbers and being disengaged from his job. Tantiado alleges that PMI terminated his employment in retaliation for expressing his "discomfort" with selling a subset of PMI's products to someone who had no role in the decision to terminate his employment. Tantiado further claims that PMI unlawfully failed to reimburse him for accrued expenses when it offset a commission from the sale of products that were ultimately returned against his final expense reimbursement.

PMI is entitled to summary judgment on these claims. In order to establish a *prima facie* case of wrongful discharge in violation of public policy under California law, Tantiado must establish that (1) he engaged in an activity protected by public policy; (2) PMI subjected him to an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Tantiado cannot establish the first or third prongs. Tantiado's expressions of "discomfort" hardly count as engaging in an activity protected by public policy and, therefore, fall short of the evidence necessary to establish the first element of the claim. But even if the Court were to ignore the absence of any protected activity, Tantiado's wrongful discharge claim fails for the simple reason that he admits he never expressed his "discomfort" or otherwise complained about the safety of PMI's products to the lone individual who decided to terminate his employment, PMI's CEO Michael Whitman and, therefore, cannot establish causation. The only information Whitman had before him when he decided to terminate Tantiado's employment is that Tantiado's sales numbers were not good and that Tantiado had lost the motivation to sell PMI's products.

Tantiado's expense reimbursement claim fares no better. Tantiado's claim is not so much for expense reimbursement as it is a claim for the commission that was offset against his expense reimbursement. California law is clear that the right to a commission depends on the terms of the

1

commission plan. Under PMI's commission plan, sales commissions paid to its sales representatives are subject to offset if those same products are subsequently returned by customers. For months before Tantiado's employment terminated, the University of California San Francisco had been trying to return products for which PMI had already paid Tantiado a commission, but Tantiado was either nonresponsive or an obstacle to the University of California San Francisco's efforts. Accordingly, once the products were returned, PMI offset the commission it had already paid Tantiado for those products against his expense reimbursement and paid Tantiado the difference. In short, Tantiado got exactly what he was owed. There is nothing unlawful about that. Regardless, if the allegations of Tantiado's complaint are true, he is not entitled to reimbursement anyway. California Labor Code § 2802(a), the statutory provision governing employee expense reimbursements, requires an employer to indemnify an employee for expenditures or losses incurred by the employee "unless the employee, at the time of obeying the directions, believed them to be unlawful." Here, Tantiado alleges that by selling certain of its products, PMI "violated 21 U.S.C.A. § 351(e) and related FDA regulations including 21 CFR 803 and 21 CFR et seq." Accepting this allegation as true, he is not entitled to reimbursement under California Labor Code § 2802's plain language since Tantiado believed that the sale of PMI's products was unlawful.

There are no genuine issues of material fact on these claims. PMI is entitled to summary judgment.[1]

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Power Medical Interventions, Inc. ("PMI") is an integrated medical device company that develops and sells computer-assisted, power-actuated endomechanical instruments that surgeons use for cutting, stapling and tissue manipulation in bariatric, cardiothoracic, colorectal and general surgical applications.

2.  PMI sells its products through its direct sales force.

---

[1] PMI does not move for summary judgment on Tantiado's claim that PMI has unlawfully failed to pay his accrued vacation.

2

3. PMI hired Tantiado as an at-will Sales Associate for PMI's San Francisco territory in July 2004. (Deposition of Myrick Tantiado ("Tantiado Dep.") at 47-48; Tantiado Dep. Ex. 3.)

4. Tantiado's compensation package included commissions on "net sales." (Tantiado Dep. Ex. 3.)

5. Tantiado understood a "net sale" to be defined in accordance with industry practice. (Tantiado Dep. at 40.)

6. Under the industry practice -- and therefore, PMI's commission policy -- sales commissions paid to sales representatives are subject to offset if those same products are subsequently returned by customers during the evaluation period. (Deposition of Robert Chase ("Chase Dep.") at 49-50; Defendant Power Medical Intervention's Supplemental Answers to Plaintiff's First Set of Interrogatories, Answer to Interrogatory No. 22.)

7. Tantiado's job was to increase sales of the full line of PMI's products. (Tantiado Dep. at 65.)

8. During Tantiado's employment at PMI, PMI had three product lines: straight linear cutters, right-angle linear cutters, and circular staplers. Although the number of products in each product line expanded over the course of Tantiado's employment at PMI, there were typically three to four products in each product line. (Tantiado Dep. 65; Chase Dep. at 59.)

9. When Tantiado started working for PMI, he reported to Robert Chase, Regional Manager for Tantiado's sales territory. (Tantiado Dep. 48-49; Tantiado Dep. Ex. 3.)

10. Shortly after Tantiado began working for PMI, PMI provided Tantiado with training on its sales procedures, which included training on PMI's product return policy. (Tantiado Dep. at 72; Tantiado Dep. Ex. 14.)

11. Under PMI's return policy, customers are entitled to return products within 60 days of purchase, unless this 60-day evaluation period is extended. (Tantiado Dep. at 72; Tantiado Dep. Ex. 14.)

3

12. Tantiado also received training on the procedures PMI has established to report problems with PMI's products, such as when a product fails during surgery. (Tantiado Dep. at 69-70.)

13. These procedures require an employee promptly after receiving a product complaint to submit an "Initial Contact Report" ("ICR") describing the problem to PMI's Quality Assurance Department ("QAD") and to provide a copy of the ICR to his or her supervisor. Upon receiving an ICR, the QAD processes it to evaluate whether PMI should report the problem to the United States Food and Drug Administration ("FDA"). (Tantiado Dep. at 69-70; Tantiado Dep. Ex. 13.)

14. Tantiado submitted ICRs throughout his employment at PMI. (Tantiado Dep. at 101-102.)

15. Tantiado received his first performance evaluation on November 1, 2004. (Tantiado Dep. at 74; Tantiado Dep. Ex. 16.)

16. This performance evaluation covered the first 60 days of Tantiado's employment with PMI and stated that his "performance over the past two months (Sept-Oct, 2004) ranks you as one of the top performing Sales Associates for PMI." (Tantiado Dep. at 74; Tantiado Dep. Ex. 16.)

17. Tantiado remained successful and received the "Regional Sales Representative of the Year 2004" award. (Tantiado Dep. at 75-76; Tantiado Dep. Ex. 18)

18. Effective January 3, 2005, Tantiado was promoted to Senior Sales Associate for the San Francisco territory. (Tantiado Dep. at 77-78; Tantiado Dep. Ex 19.)

19. After this promotion, Tantiado continued to report to Chase. (Tantiado Dep. at 81; Tantiado Dep. Ex 19.)

20. On February 13, 2006, PMI's CEO, Michael Whitman, promoted Tantiado to Regional Manager with responsibility for managing PMI's California sales force and demoted Chase to the Senior Sales Associate position Tantiado had previously held. (Tantiado Dep. at 82-83, 87; Tantiado Dep. Ex. 20.)

21. Less than two months later, Tantiado requested that he be returned to a Senior Sales Associate role. (Tantiado Dep. at 90.)

4

1     22. PMI granted his request and, effective April 3, 2006, Tantiado and Chase switched

2  positions once again: Tantiado became a Senior Sales Associate, Rob Chase became Regional

3  Manager, and Tantiado recommenced reporting to Chase. (Tantiado Dep. at 95.)

4     23. But unlike before, Tantiado now had a sales quota and the amount he would receive in

5  commissions would depend on his meeting or exceeding his quota. (Tantiado Dep. at 92).

6     24. PMI implemented its quota system because it wanted to motivate its sales force to

7  increase sales. (Tantiado Dep. at 93.)

8     25. There was no particular sales quota for any specific product. Rather, the sales quota

9  could be satisfied by selling any combination of PMI's products. (Tantiado Dep. at 123.)

10     26. Tantiado did not "believe that Power Medical, PMI cared whether we sold one line or

11  the other." (Tantiado Dep. at 123.)

12     27. Tantiado became increasingly uncomfortable selling PMI's circular stapling products

13  throughout his employment at PMI because various surgeons reported to him that they had

14  "issues" with PMI's circular staplers, which in some instances had resulted in harm to patients.

15  (Tantiado Dep. at 98.)

16     28. Tantiado submitted ICRs documenting each such report he received to the QAD.

17  (Tantiado Dep. at 101-102.)

18     29. In 2006, Tantiado's sales performance began to decline. (*See* Affidavit of Pat Steffan

19  ("Steffan Aff.") ¶¶ 2-3, and Exhibits thereto.)

20     30. In the Spring of 2006, at a meeting of the American Society of Bariatric Surgeons,

21  Chase and Tantiado discussed whether Tantiado would be able to make his quota. At his

22  deposition, Tantiado related the substance of this conversation as follows:

23  
24  
25  
26  
27  
28  
> I recall Rob [Chase] asking me whether or not I would be able to sell the products and make quota. And I told him that I would not be able to sell the circular stapling line any longer because of my concern with the stapling line's effectiveness, and that he was concerned with whether I would be able to hit my number, or at least obtain a certain amount of revenue for the months to come. And I told him that I didn't feel that I would be able to hit my number with the limited amount of stapling product that I would have to sell in order to, you know, compensate for the items that I would not be able to sell. And

5

I think I had mentioned something to the effect of, that he -- I think he said something like, "I don't think, I don't think they would want to hear what you're saying." And, "I don't think" -- or something to the effect that, "They would not be happy with, with what you're saying.

And I told him that, you know, that I just couldn't sell the circular stapling product line, and if that meant that I would be on -- that I may possibly be terminated, then, you know, that's their prerogative. And he, he said, "Okay, well, that's what I'll tell them." And that's the gist of the conversation.

…

Now, I don't believe that it was the quota that he was asking me to hit, but that, a more manageable number that may have been less than the actual quota. And I think he said something like, you know, "You just want to make sure that they have -- that you know, they are, you know, that you're making, you know, some sort of progress in hitting your number."

(Tantiado Dep. at 96-97; *see also* Chase Dep. at 22-24.)

31. During his employment with PMI, Tantiado never told anyone at PMI that he believed it was violating 21 U.S.C. § 351(a). (Tantiado Dep. at 187.)

32. Nor did Tantiado tell anyone at PMI that it was violating regulations related to 21 U.S.C. § 351(a). (Tantiado Dep. at 187.)

33. Tantiado did not notify anyone at PMI other than Chase of problems with PMI's products except by submitting ICRs to the QAD. (Tantiado Dep. at 104; Plaintiff's Response to Defendant's First Set of Interrogatories, Answer to Interrogatory No. 5.)

34. Tantiado never relayed any concerns about any of PMI's product lines to CEO Whitman. (Tantiado Dep. at 111.)

35. Tantiado also never relayed any concerns about PMI's products to the FDA or any other government agency. (Tantiado Dep. at 120.)

36. Chase did not convey anything that Tantiado told him during their discussion at the American Society of Bariatric Surgeons meeting to anyone else. (Chase Dep. at 28.)

37. Chase did not convey anything that Tantiado told him during their discussion at the American Society of Bariatric Surgeons meeting to Whitman. (Chase Dep. at 29.)

6

38. On June 17, 2006, Chase warned Tantiado that it was "critically important" that he increase his sales. (Tantiado Dep. Ex. 23.)

39. For the first six months of 2006, Tantiado's sales numbers were below what PMI expected of him. For all twelve months of 2005, Tantiado had $286,000 in sales. However, during the six months of 2006, by contrast, Tantiado only had $51,000 in sales. (Steffan Aff. ¶¶ 2-3.)

40. In early July 2006, PMI held a managers meeting at which the general state of PMI's business was discussed. (Chase Dep. at 30, 84.)

41. Nobody from the QAD attended the managers meeting. (Chase Dep. at 35.)

42. At the managers meeting, Whitman met with Pat Holmes and Chase to discuss the sales performance of the territory for which Chase was Regional Manager, including a discussion of Tantiado's 2006 sales performance which had declined precipitously from his 2005 sales numbers and were below the minimum requirements for his job. (Affidavit of Michael Whitman ("Whitman Aff.") ¶ 2.)

43. Whitman asked Chase how Tantiado was doing, given his move from Senior Sales Associate to Regional Manager and back earlier in the year. (Chase Dep. at 31, 33.)

44. Chase responded to Whitman that Chase did not think that Tantiado was fully engaged in selling PMI's products and that Chase felt there were "opportunities there to do more from a sales perspective ... and engage more than what he was currently exhibiting or doing." (Chase Dep. at 31-33.)

45. Chase said nothing to Whitman about Tantiado's reluctance to sell PMI's circular staplers. (Chase Dep. at 32.)

46. Based on Tantiado's sales numbers, Whitman instructed Chase to terminate Tantiado's employment. (Whitman Aff. ¶ 3; Chase Dep. at 34, 42; Defendant Power Medical Intervention's Supplemental Answers to Plaintiff's First Set of Interrogatories, Answer to Interrogatory No. 3.)

47. There was no discussion of product performance issues at the managers meeting. (Chase Dep. at 31.)

7

48. Nor was there any discussion regarding difficulties related to the sale of PMI's circular staplers.  (Chase Dep. at 31.)

49. When Chase returned from the managers meeting, he informed Tantiado that his employment had been terminated.  (Tantiado Dep. at 127.)

50. Tantiado's employment with PMI terminated on July 10, 2006.  (Tantiado Dep. Ex. 24.)

51. On July 12, 2006, Tantiado submitted expense reports to PMI seeking reimbursement for $4,464.03 in expenses.  (Tantiado Dep. 135.)

52.  However, for months before Tantiado's employment terminated, the University of California San Francisco ("UCSF") had been trying to return products during the 60-day evaluation period (as extended by Tantiado) for which PMI had already paid Tantiado a commission.  (Tantiado Dep. at 143; Tantiado Dep. Ex. 30; Affidavit of Rita Esposito ("Esposito Aff.") ¶ 2, and Exhibit thereto.)

53. But rather than process the return, Tantiado tried to salvage the account by presenting UCSF with alternative options and rallying the support of various surgeons to keep PMI's products at UCSF.  (Tantiado Dep. at 144-145.)

54. On the same day that Tantiado's termination became effective, PMI received an email from UCSF informing it that it had been trying to return the products since February 2006 but Tantiado had "either been unresponsive or an obstacle in getting these items returned."  (Esposito Aff. ¶ 2, and Exhibit thereto.)

55. Once the products were returned, PMI offset the commission it had already paid Tantiado for the returned products against his pending expense reimbursement and paid Tantiado the difference.  (Tantiado Dep. at 158; Tantiado Dep. Ex. 31.)

## III.     ARGUMENT

### A.     Tantiado's Wrongful Discharge Claim Fails As A Matter Of Law.

An employer may discharge an at-will employee "for no reason, or for an arbitrary or irrational reason," but is precluded from doing so "for an unlawful reason or a purpose that

8

1  contravenes fundamental public policy." *Gantt v. Sentry Ins.,* 1 Cal. 4th 1083, 1094 (1992). *See*

2  *also* Cal. Lab. Code § 2922. In assessing a claim for wrongful discharge on a motion for summary

3  judgment, California courts apply the burden-shifting framework outlined in *McDonnell Douglas*

4  *Corp. v. Green*, 411 U.S. 792 (1973). *See Benhabib v. Hughes Elecs. Corp.*, No. 04-0095, 2007

5  U.S. Dist. LEXIS 87500 (C.D. Cal. Mar. 30, 2007). In order to establish a *prima facie* case of

6  wrongful discharge, the plaintiff must initially establish each of the following elements: (1)

7  plaintiff engaged in a protected activity; (2) his employer subjected him to an adverse employment

8  action; and (3) there was a causal connection between the protected activity and the protected

9  employment action. *Anderson v. Union Pac. R.R. Co.*, No. S-06-2813, 2008 U.S. Dist. LEXIS

10  41776 (E.D. Cal. May 20, 2008). Once the plaintiff has established a *prima facie* case, the burden

11  shifts to the employer to offer a legitimate, non-retaliatory reason for the adverse employment

12  action. If the employer does so, the inference of retaliation is overcome, and plaintiff must then

13  provide evidence to demonstrate that the legitimate reason proffered by the defendant is merely a

14  pretext.

15      Tantiado claims that he was terminated for telling Chase that he lacked confidence in

16  PMI's products and, as such, was uncomfortable selling them. Tantiado's wrongful discharge

17  claim fails because he cannot establish a *prima facie* case and, even if could, the undisputed

18  evidence is that Tantiado was terminated for poor performance, not because of his "discomfort."

19          1.      Tantiado Cannot Establish A *Prima Facie* Case.

20                  a.      Tantiado Did Not Engage In Protected Activity.

21      Tantiado cannot establish that he engaged in activity protected by "public policy." The

22  "public policies" giving rise to a wrongful discharge claim are exceedingly narrow. "Although our

23  legislature has determined that an employment contract is generally terminable at either party's

24  will … we have created a narrow exception to this rule by recognizing that an employer's right to

25  discharge an at-will employee is subject to limits that fundamental public policy imposes." *Green*

26  *v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 71 (1998). The "public policy" asserted must be sufficiently

27  described in a constitution, statute, or regulation "to enable an employer to know the fundamental

28

9

1   policies that are expressed in that law." *Sequoia Ins. Co. v. Superior Court*, 13 Cal. App. 4th 1472,

2   1480 (1993); *compare Morelewicz v. GEICO*, No. 04-56358, 2006 U.S. Dist. LEXIS 28638 (9th

3   Cir. Nov. 17, 2006) (plaintiff cannot cite preamble to show violation of statute that implicates

4   fundamental public policy). "A public policy exception carefully tethered to the fundamental

5   policies that are delineated in constitutional or statutory provisions strikes the proper balance

6   among the interests of employers, employees, and the public." *Id.* This is because "tethering a

7   public policy claim to specific constitutional or statutory provisions serves not only to avoid

8   judicial interference with the legislative domain, but also to ensure that employers have adequate

9   notice of the conduct that will subject them to tort liability to the employees they discharge."

10   *Esberg v. Union Oil Co.*, 28 Cal. 4th 262, 271-72 (2002).

11     Against this legal background, Tantiado's claim that he engaged in protected activity must

12   fail because there is no "public policy" against firing employees who are uncomfortable

13   performing their jobs or lack confidence in their employer's products. No constitutional provision,

14   statute, or regulation prohibits an employer from terminating such an employee. *See Green v.*

15   *Ralee Eng'g Co.*, 19 Cal. 4th 66 (1998). And no court has ever held otherwise, much less in the

16   context of a wrongful termination in violation of public policy case. This is not surprising.

17   Employees often convey some discomfort about aspects of their jobs. Expanding the narrow

18   "wrongful discharge in violation of public policy" exception to cover such expressions would

19   swallow the general rule of at-will employment.

20     Accordingly, Tantiado did not engage in any protected conduct. Since there is no provision

21   of law protecting employees who are uncomfortable with particular aspects of their jobs, Tantiado

22   cannot claim that he was fired for refusing to violate the law, exercising a right guaranteed by law,

23   or for reporting illegality, the only circumstances in which California courts have recognized

24   wrongful discharge claims. *See id.* ("[P]ublic policy cases fall into one of four categories: the

25   employee (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a

26   constitutional or statutory right or privilege; or (4) reported a statutory violation for the public's

27   benefit.").

28

10

To avoid this problem, Tantiado now alleges that his termination was in retaliation for his complaints that PMI was violating "21 U.S.C.A. 351(e) and related regulations including 21 CFR 803 and 21 CFR 820 et seq.," which define the term "adulterated" for medical devices, among other things, under the Federal Food, Drug, and Cosmetic Act. There are three fundamental flaws in this argument. First, 21 U.S.C. § 351 does nothing more than define the word "adulterated." It imposes no rights, obligations, privileges, or immunities. It is impossible to violate a definition. *See Sequoia Ins. Co.*, 13 Cal. App. 4th at 1480 ("a constitutional or statutory provision must sufficiently describe the type of prohibited *conduct*" (emphasis added)). Second, Tantiado never told anyone at PMI that he thought PMI was violating these provisions or was otherwise doing anything unlawful. All he said was that he "would not be able to sell the circular stapling line any longer because of his concern with the stapling line's effectiveness." Tantiado Dep. at 96. *See Stiesberg v. California*, 80 F.3d 353 (9th Cir. 1996) (affirming dismissal of plaintiff's retaliation claim because "he reported no illegal conduct to anyone"). Third, Tantiado has presented no evidence that he had ever considered the sale of PMI's products to be in violation of the statute or regulations which he cites in his complaint. *See Jhingan v. Roche Molecular Systems*, No. C 94-3176, 1996 WL 466577 (N.D. Cal. May 13, 1996).

Tantiado did nothing that is protected by public policy. PMI is entitled to summary judgment on Tantiado's wrongful discharge claim.

        b.    There Is No Evidence Linking Whitman's Termination Decision To Tantiado's "Complaint".

Ignoring for the moment that Tantiado's expressions of "discomfort" with selling PMI's circular staplers does not constitute protected activity, Tantiado cannot establish the requisite causal connection between his alleged protected activity and his termination. To establish causation, a plaintiff must prove, among other things, that the decision-maker was aware of the protected activity. *See Cocchi v. Circuit City Stores, Inc.*, No. C-05-1347, 2006 U.S. Dist. LEXIS 20126 at *24-27 (N.D. Cal. Apr. 3, 2006) (granting summary judgment against plaintiff's wrongful discharge claim where the decision-maker lacked knowledge that the plaintiff engaged in protected activity); *Adams v. Kmart Corp.*, No. C 00-03885, 2001 U.S. Dist. LEXIS 12827 (N.D. Cal. Aug.

11

1   10, 2001) (same). Yet, here, it is undisputed that: (1) Tantiado only expressed his discomfort with

2   selling PMI's circular staplers to Chase, (2) Chase never told anyone -- including Whitman --

3   about Tantiado's discomfort with selling the circular staplers, and (3) Whitman was the sole

4   decision maker regarding the termination of Tantiado's employment. Whitman could not have

5   been motivated to terminate Tantiado for engaging in protected activity because he had no idea

6   that Tantiado had engaged in such activity. Indeed, Whitman terminated Tantiado for poor sales

7   numbers, not for Tantiado's "discomfort" with PMI's products. These three undisputed facts

8   sound the death knell for Tantiado's wrongful termination in violation of public policy claim.[2]

9       It does not matter that Chase supplied Whitman with information Whitman relied upon in

10  terminating Tantiado. This Court's decision in *Adams v. Kmart Corp.*, No. C 00-03885, 2001 U.S.

11  Dist. LEXIS 12827 (N.D. Cal. Aug. 10, 2001), is directly on point. In that case, the plaintiff

12  claimed that he was wrongfully terminated in violation of public policy for reporting to his direct

13  supervisor, Mr. Barter, that another employee had re-labeled meat that was no longer fresh and had

14  tried to re-grind old hamburger meet. However, there was no evidence that Mr. Barter had

15  relayed this report to the individual who decided to terminate the plaintiff, Mr. Bronson. The

16  plaintiff argued, in effect, that the employer's summary judgment motion should be denied

17  because of the possibility that Mr. Barter recommended termination to Mr. Bronson because of the

18  plaintiff's protected activity, even though Mr. Bronson was oblivious to Mr. Barter's true reason

19  for the recommendation. The Court rejected this argument because there was no proof that Mr.

20  Barter recommended that the plaintiff be terminated. Similarly, here, there is no evidence

21  whatsoever that Chase recommended termination. Rather, he simply told Whitman that Tantiado

22  seemed unmotivated. As in *Adams*, Chase did not recommend that Whitman do anything.

23

24

---

25  [2] The only other individuals to whom Tantiado disclosed problems with PMI's products worked in
    the QAD when he submitted ICRs pursuant to PMI's procedures established to receive exactly
26  those types of complaints. Aside from the fact that there is no evidence that anyone from the QAD
    told Whitman that Tantiado had submitted ICRs, it is unlikely in the extreme that PMI would go
27  through the trouble of establishing such procedures only to "retaliate" against employees for using
    them.

28

1    Tantiado's inability to establish a causal link between his "protected activity" and the

2    termination means that he has no *prima facie* case.  PMI is thus entitled to summary judgment on

3    Tantiado's wrongful discharge in violation of public policy claim.  The Court need proceed no

4    further.

5                    2.    PMI Terminated Tantiado For A Legitimate Reason.

6    Even if Tantiado could establish a *prima facie* case, it would make no difference; PMI has

7    articulated a legitimate business reason for terminating Tantiado's employment, and as discussed

8    below, Tantiado has failed to present any evidence that that reason is false.  It is undisputed that

9    Tantiado's sales numbers were lower than expected.  Moreover, Chase had told Tantiado that all

10    he had to do is *sell something*, even if he did not meet his quota.  It is also undisputed that

11    Tantiado's 2006 sales numbers had dropped precipitously from prior years.  Finally, it is

12

13    undisputed that Whitman terminated Tantiado because his sales numbers were down and Tantiado

14    appeared unmotivated to improve them.  At the risk of stating the obvious, it is well-established

15    that it is legitimate to terminate an employee for poor performance.  *See, e.g., Hoy v. Sears,*

16    *Roebuck & Co.*, 861 F. Supp. 881 (N.D. Cal. 1994) (failure to meet sales quota constitutes "good

17    cause" for termination); *Knights v. Hewlett Packard*, 230 Cal. App. 3d 775, 780 (1991) ("Instances

18    of poor performance are justifiable reasons for termination."); *Moore v. May Dept. Stores Co.*, 222

19

20    Cal. App. 3d 836 (1990) (where "there [is] no hint that the asserted reason for [an employee's]

21    termination was capricious or unrelated to business needs or goals, or pretextual. . . . a jury should

22    not be allowed to decide the correctness of [the employer's] business judgment in terminating" the

23    employee).

24                    3.    Tantiado Cannot Show That PMI's Legitimate Reason Is Pretext.

25    The burden thus shifts back to Tantiado to show that PMI's reasons for terminating his

26    employment were a pretext, and the real motive was for engaging in conduct protected by a

27    fundamental public policy.  To meet this burden, Tantiado must produce *specific* and *substantial*

28

13

1  evidence that PMI's reasons are really a pretext for discrimination. *See Aragon v. Republic Silver*

2  *State Disposal, Inc.*, 292 F.3d 654, 661 (9th Cir. 2002); *Martin v. Lockheed Missiles & Space Co.*,

3  29 Cal. App. 4th 1718, 1732-33 (1994) ("[T]o meet an employer's sufficient showing of a

4  legitimate reason for discharge the discharged employee, to avert summary judgment, must

5  produce *substantial responsive evidence* that the employer's showing was untrue or pretextual."

6  (emphasis added)). "For this purpose, speculation cannot be regarded as substantial responsive

7  evidence." *Martin*, 29 Cal. App. 4th at 1732-33.

8       There is no such evidence. As discussed above, the only information before Whitman

9  when he decided to discharge Tantiado was that his sales numbers were down and he was

10  unmotivated. There is no evidence that PMI did not discharge underperforming employees who

11  believed wholeheartedly in the effectiveness of PMI's products. Nor is there any other evidence

12  casting doubt on the legitimacy of PMI's reason for firing him, notwithstanding that the parties

13  have completed discovery. *See id.* ("The purpose of the summary judgment procedure, as we

14  perceive it, is to identify those cases in which there is no factual issue which warrants the time and

15  cost of factfinding by trial. Obviously the procedure cannot fairly serve its purpose unless and until

16  all parties have had sufficient opportunity, through discovery and otherwise, adequately to develop

17  their factual cases. But where, as here, the parties have received (and apparently have utilized)

18  that opportunity, we believe the correct rule to be that to meet an employer's sufficient showing of

19  a legitimate reason for discharge the discharged employee, to avert summary judgment, must

20  produce 'substantial responsive evidence' that the employer's showing was untrue or pretextual.").

21       Tantiado has thus offered nothing to show that PMI fired him for other than legitimate

22  business reasons. The motion for summary judgment should be granted.

23  **B.    PMI Reimbursed Tantiado For All Expenses To Which He Is Entitled.**

24       Tantiado also alleges that PMI failed to reimburse him for all of his expenses because PMI

25  offset the commission it had already paid him for the UCSF products that were returned against his

26  expense reimbursement and paid Tantiado the difference.

27

28

14

1                    1.    Tantiado Was Fully Reimbursed.

2          PMI fully reimbursed Tantiado for his expenses.  Tantiado admits that PMI offset the

3    commission it had already paid him for the products UCSF returned against his expense

4    reimbursement and paid him the difference.  As a result, the question is not whether Tantiado was

5    reimbursed for his expenses.  He was, although the reimbursement check was reduced by the

6    amount of the commission previously paid on the returned products.  Rather, the real issue is

7    whether it was lawful to offset the commission against Tantiado's expense reimbursement.

8          California courts have upheld chargebacks in similar circumstances.  In *Steinhebel v. Los*

9    *Angeles Times Communications*, 126 Cal. App. 4th 696 (2005), the court found that an employer's

10   chargeback of commission advances on newspaper subscriptions against telemarketers' future

11   advances on commission if customers did not keep their subscriptions was not a violation of

12   California Labor Code § 221, which requires employers to pay accrued wages.  The telemarketers

13   were aware that a sale did not qualify as a "commissionable order" until the customer kept the

14   subscription for 28 days, and the telemarketers agreed that they would receive advances before the

15   employer could ascertain whether the sales would actually ripen into "commissionable orders."

16   The court held that advances on commissions did not constitute the payment of "wages," and the

17   28-day requirement was a condition precedent to the telemarketers' entitlement to a commission.

18   Similarly, in *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313 (2006), the court held that an employer

19   was entitled to chargebacks on commissions paid even though the compensation plans provided

20   that commissions would be paid when order was booked because employees had post-booking

21   responsibilities necessary to earn their commissions, and, although commission plans provided that

22   commissions would be paid at booking or installation, associates agreed that they were not in fact

23   earned at that time.  Under these cases, the lawfulness of a chargeback depends on the terms of the

24   commission plan.

25         PMI's chargeback of the UCSF commission was lawful.  It is undisputed that PMI paid

26   commissions on "net sales."  Tantiado admits that "net sales" at PMI were determined by industry

27   practice.  Chase, in turn, testified that under industry practice, sales commissions paid to sales

28                                                    15

1    representatives are subject to offset if those same products are subsequently returned by customers

2    during the evaluation period.  That is exactly what happened here.  PMI paid Tantiado a

3    commission on sales to UCSF, UCSF returned the products, and PMI charged back the

4    commission by offsetting it against Tantiado's final expense reimbursement check.  PMI paid

5    Tantiado what he was owed.

6         There is nothing unlawful about offsetting the chargeback against Tantiado's expense

7    reimbursement.  In *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (2007), the California

8    Supreme Court held that an employer does not violate California Labor Code § 2802 by increasing

9    an employees base salary or commissions to include an estimated prediction of expense

10   reimbursements, provided the employer makes it clear what portion of the salary or commissions

11   is compensation and what portion is expense reimbursement.  But if the portion representing the

12   estimated expense reimbursement is not sufficient to cover actual expenses, the employer must

13   make up the difference: "section 2802 does not prohibit an employer's use of a lump-sum method

14   to reimburse employees for work-required automobile expenses, provided that the amount paid is

15   sufficient to provide full reimbursement for actual expenses necessarily incurred. Nothing in the

16   language of section 2802 restricts the methods that an employer may use to calculate

17   reimbursement, and we are required to construe section 2802 in a manner that produces a workable

18   and reasonable result."   In a nutshell, employers can offset reimbursements against salary or

19   commissions.   This case is the converse.  Rather than offsetting reimbursements against

20   commissions, PMI offset Tantiado's excess commission against his expenses using a lump sum

21   method and told him that was what it was doing.  It would defy reason to find that an employer

22   may permissibly offset reimbursements against commissions but cannot offset commissions

23   against reimbursements.

24        Tantiado's claim that the offset was somehow impermissible because the return was not

25   completed until after his employment terminated is disingenuous.  UCSF told Tantiado months

26   before his employment terminated that it wanted to return the products.  Tantiado then stalled, in

27   hopes of keeping PMI products at UCSF.  It would be an odd rule that would permit an employee

28

16

1  to ignore a customer's request for help in processing a return yet still be entitled to a commission

2  based on the fact that the products were not returned.  Nevertheless, there is no reason for the

3  Court to contemplate such a rule since under *Steinhebel* and *Koehl*, the lawfulness of a chargeback

4  depends on the terms of the commission plan and, here, PMI's commission plan permits

5  chargebacks for products returned during the evaluation period.

6      PMI paid Tantiado exactly what he was owed.  Therefore, PMI is entitled to summary

7  judgment on Tantiado's claim that PMI violated § 2802 by not reimbursing his expenses.

8      2.    Accepting His Allegations As True, Tantiado Was Not Entitled To Have
             His Expenses Reimbursed.

9

10     Be that as it may, Tantiado was not entitled to reimbursement at all.  California Labor Code

   § 2802(a), the statutory provision governing employee expense reimbursements, provides: "An
11

12 employer shall indemnify his or her employee for all necessary expenditures or losses incurred by

13 the employee in direct consequence of the discharge of his or her duties, or of his or her obedience

14 to the directions of the employer, even though unlawful, unless the employee, at the time of

15 obeying the directions, believed them to be unlawful."  Here, Tantiado's complaint alleges that

16 selling the circular staplers "violated 21 U.S.C.A. § 351(e) and related FDA regulations including

17 21 CFR 803 and 21 CFR et seq."  If Tantiado believed that the sale of PMI's products was

18 unlawful as he alleges in his complaint, he is not entitled to reimbursement for expenses incurred

19 in selling PMI's circular staplers under California Labor Code § 2802's plain language.

**IV.    CONCLUSION**

20     For the reasons stated herein, PMI respectfully requests that this Court allow its partial for

21 summary judgment on Tantiado's claims or wrongful discharge in violation of public policy and

22 failure to reimburse expenses.

23

24

25

26

27

28

1

2

DATED: July __, 2008

Respectfully submitted,

3

BARTKO, ZANKEL, TARRANT & MILLER
A Professional Corporation

4

5

6

By: _____
Alyson Huber
Attorneys for Defendant
POWER MEDICAL INTERVENTIONS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18