**EXHIBIT A, PART 1**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MYRICK TANTIADO, an individual,)
                           )
       Plaintiff,     )
   vs.             )  Case No. C07-02874
                           )  CRB MED
POWER MEDICAL INTERVENTIONS, a )
Pennsylvania corporation, and )
DOES ONE through FIFTY,     )
inclusive,            )
                           )
       Defendants.   )
                           )

# CERTIFIED COPY

DEPOSITION OF

MYRICK TANTIADO

———————

April 10, 2008

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#408119]

**M E R R I L L   L E G A L   S O L U T I O N S**

135 Main Street, 4th Floor
San Francisco, CA 94105
www.merillcorp.com/law

415.357.4300 Tel

MYRICK TANTIADO    April 10, 2008

```
 1                        --oOo--
 2          Deposition of MYRICK TANTIADO, taken by the
 3    Defendant at 900 Front Street, San Francisco,
 4    California, commencing at 10:18 a.m. on April 10, 2008,
 5    before CAROLYN M. MANN, CSR, pursuant to Notice.
 6                        --oOo--
 7                 A P P E A R A N C E S
 8    FOR THE PLAINTIFF:
 9              MOSCONE, EMBLIDGE & QUADRA LLP
                220 Montgomery Street, Suite 2100
10              San Francisco, California  94104
                BY:  MARK L. MOSLEY
11
      FOR THE DEFENDANT:
12
                FOLEY HOAG LLP
13              Seaport World Trade Center West
                155 Seaport Boulevard
14              Boston, Massachusetts  02210
                BY:  JOHN EARL DUKE
15
                        --oOo--
16
17
18
19
20
21
22
23
24
25
```

5

Merrill Legal Solutions
(800) 869-9132

MYRICK TANTIADO    April 10, 2008

1    Q.    So your understanding of a net sale at the

2    time you started working for PMI was that a net sale was

3    essentially whatever a net sale was according to

4    industry practice?

5    A.    I believe so.

6    Q.    Yes or no?

7    MR. MOSLEY:  Well, he answered it.

8    You can answer it again.  You don't have to

9    change your answer to a yes or a no if "I believe so" is

10   the best answer you can give.

11   MR. DUKE:  Q.  Did you have any reason to

12   believe that that was not going to be the case?

13   A.    I don't think so.

14   Q.    And when you started working for PMI you were

15   entitled to be reimbursed for expenses as outlined in

16   PMI's employee handbook, right?

17   A.    I believe so.

18   Q.    Did you ask anybody what that meant?

19   A.    What what meant?  Can you . . .?

20   Q.    What, for example -- did you ask anyone what

21   expenses you'd be reimbursed for?

22   A.    I don't recall whether I asked anyone

23   specifically, or if that was presented to me during a

24   meeting, a new hire meeting or sales training.  I

25   believe that when we were hired, when I was hired, there

40

MYRICK TANTIADO      April 10, 2008

1    Q.   Going back a little bit, before you accepted

2    PMI's offer of employment, did you negotiate with PMI

3    over the terms of the offer?

4    A.   I don't recall whether I did negotiate or did

5    not.

6    Q.   Did PMI, prior to your acceptance, offer to

7    sweeten the terms of the offer?

8    A.   I don't recall whether they wanted to sweeten

9    the terms of the offer.

10    Q.   Did you receive any other job offers around

11    the time that you accepted employment with PMI?

12    A.   I don't remember.

13    Q.   Were you applying for positions with other

14    employers around the time you were applying to PMI?

15    A.   I may have, but I don't remember.

16    Q.   Had you interviewed with any other companies

17    around the time that you were applying for a position

18    with PMI?

19    A.   I may have, but I don't remember.

20    Q.   When did you start working at PMI?

21    A.   I believe it was July of 2004.

22    Q.   What was your job title?

23    A.   I believe I was territory manager.  I'm not

24    certain if that was the exact title.  It could have been

25    senior sales associate, or --

47

MYRICK TANTIADO      April 10, 2008

1     Q.    Could you look --

2     A.    -- sales associate.

3     Q.    Could you look back at Exhibit 3, which is the

4 offer letter.  Does that refresh your recollection as to

5 what your job title was when you started working for

6 PMI?

7     A.    Let's see.

8     Q.    Specifically directing you to the first

9 paragraph.

10    A.    Yes.

11    Q.    What was your job title?

12    A.    According to this, I was sales associate.

13    Q.    You said that refreshed your recollection,

14 correct?  As to your job title.

15    A.    It refreshes my recollection of my job title.

16    Q.    And so based on your recollection, what was

17 your job title when you first started working at PMI?

18    A.    After having looked at this document, my job

19 title was sales associate when I started with the

20 company.

21    Q.    When you started working for PMI, who did you

22 report to?

23    A.    Rob Chase.

24    Q.    What was his job title?

25    A.    According to that document, his job title was

Merrill Legal Solutions
(800) 869-9132

1    general manager.

2        Q.    Based on your recollection, what was his job

3    title?

4        A.    Based on my recollection after having looked

5    at that document, his title was general manager.

6        Q.    Did you report directly to anyone else at PMI

7    other than Rob Chase?

8        A.    No.

9        Q.    After you started working for PMI, PMI sent

10   you a copy of its employee handbook, correct?

11       A.    I believe so.

12             MR. DUKE:  Could you mark this as Exhibit 7,

13   please.

14             (Deposition Exhibit 7 was marked for

15             identification.)

16             THE WITNESS:  Thank you.

17             MR. DUKE:  Q.  Do you recognize this document?

18       A.    Yes.

19       Q.    Is this the letter that enclosed the employee

20   handbook?

21       A.    Yes, it is.

22       Q.    You received the employee handbook, correct?

23       A.    I believe I did.

24             MR. DUKE:  Could you mark this as Exhibit 8,

25   please.

49

MYRICK TANTIADO    April 10, 2008

1       Q.    We'll move on.

2       A.    -- or is there a question?

3       Q.    Yeah, there was a question.  We'll move on.

4    It's fine.

5             After you started working at PMI, what did you

6    understand your duties to be?

7       A.    To increase sales in my territory of the

8    SurgAssist stapler.

9       Q.    And I believe you testified that before -- and

10   correct me if I'm wrong -- at this time, the SurgAssist

11   stapling product or line of products was the only thing

12   that PMI sold?

13      A.    At the time of employment, the stapling

14   products that I had described were the only products

15   that we had sold.  But after my employment, we had added

16   other stapling product lines within that family of

17   SurgAssist products.

18      Q.    Did you receive any training?

19      A.    Yes.

20      Q.    What did the -- of what did the training

21   consist?

22      A.    I believe the training at Power Medical

23   Interventions was primarily on the product lines and how

24   they interfaced with various types of surgeries, the

25   advantages of using the product in various types of

1    the part where a product does not work and was used in

2    surgery, and then we have to return -- so I was, I

3    misunderstood what you meant by product return, because

4    I was thinking that you were meaning product returned

5    after a surgeon had used the product, it was in the

6    patient, it did not work, and then we had to send it

7    back as faulty, as a faulty product. But you're

8    referring to, now that you're asking this question, I

9    think you're referring to if the customer wants to send

10   product back that was not used? Is that what you're

11   referring to?

12        Q.   Let's talk about both. Let's talk about how

13   you handle product returns in the situation where the

14   product's been used. What's the procedure for that?

15        A.   So if a surgeon uses this product and it fails

16   to work within the, within the surgery, within surgery,

17   I would fill out an ICR report stating what had happened

18   within that procedure and submit that to quality

19   assurance within Power Medical Interventions, copy my

20   immediate supervisor, and send the product back in a

21   biohazardous containment package. Then the product

22   would be evaluated to determine what was at fault, and I

23   would receive a response back to determine whether we

24   were taking action to fix the product, or it would

25   explain what we were doing, and I would provide that

MYRICK TANTIADO    April 10, 2008

1   letter to the surgeon.  So that, that's a product return

2   after the product malfunctioned during a procedure.

3       Q.    And how would you handle a product return

4   where the product had not been used in a procedure?

5       A.    I have never had any product returns while I

6   was employed with Power Medical Interventions, so I

7   don't know how to answer that question.

8           MR. MOSLEY:  You want to find a good breaking

9   spot for lunch?

10          MR. DUKE:  In a bit.

11      Q.    Was Novato Hospital a PMI account in your

12  territory?

13      A.    Novato Community Hospital, correct.

14      Q.    You sold Novato Community Hospital one of

15  PMI's products called an RALC-30, right?

16      A.    I may have.

17      Q.    What is an RALC-30?

18      A.    Right angle linear cutter, 30-millimeter.

19      Q.    Do you recall that after making a sale of the

20  RALC-30 to Novato Community Hospital, the hospital

21  realized that it ordered the wrong product?

22      A.    I vaguely remember that.

23      Q.    And Novato hospital then returned the product

24  that it ordered incorrectly to PMI, correct?

25      A.    I vaguely remember that.

70

MYRICK TANTIADO    April 10, 2008

1    form.  Okay.

2         Q.   And it also contains a section on PMI's return

3    policy, correct?

4         A.   Yes.  I just turned to that section.

5         Q.   Are these slides that you received in a

6    training session with PMI?

7         A.   I believe they may have been slides.  I don't

8    recall specifically if they were slides or if this was

9    part of my training manual.

10        Q.   Oh, okay.  The section of this exhibit dealing

11   with product returns, does it accurately reflect the

12   training that you received at PMI regarding how to

13   handle product returns?

14        A.   Yes.  I believe so.

15        Q.   Did you also receive training on PMI's expense

16   reimbursement policy?

17        A.   I may have.  I don't specifically recall if we

18   had training on, you know, on that.

19             MR. DUKE:  Can you mark this as Exhibit 15,

20   please.

21             (Deposition Exhibit 15 was marked for

22             identification.)

23             THE WITNESS:  Thank you.

24             MR. DUKE:  Q.  Do you recognize this document?

25        A.   Yes.

72

1    please.

2                (Deposition Exhibit 16 was marked for

3                identification.)

4            THE WITNESS:  Thanks.

5            MR. DUKE:  Q.   Does this document refresh your

6    recollection as to whether you received a 60-day

7    performance review?

8        A.    Yes.

9        Q.    Do you recognize this document?

10       A.    Yes.

11       Q.    And this is a review by Rob Chase of your

12   performance during the first 60 days of your employment

13   with PMI?

14       A.    Yes.

15       Q.    Did you consider this to be a positive review?

16       A.    Yes.

17           MR. DUKE:  Mark this as Exhibit 17, please.

18           (Deposition Exhibit 17 was marked for

19           identification.)

20           THE WITNESS:  Thank you.

21           MR. DUKE:  Q.   Do you recognize this document?

22       A.    Yes.

23       Q.    What is it?

24       A.    An e-mail exchange.  Excuse me.

25       Q.    And you wrote this e-mail, correct?

74

1    California.  Actually, excuse me.  I believe there was

2    someone in Southern California as well.  I just don't

3    remember his name.

4        Q.    Okay.  So this award is for the entire region

5    of California?

6        A.    I believe so.

7        Q.    Shortly after receiving this award, were you

8    promoted?

9        A.    I don't recall the exact time frame when I was

10   promoted, from when I received this reward, award to

11   when I was actually promoted.  So, but I was promoted, I

12   just don't know how -- the time frame.

13       Q.    Okay.  So at some point you were promoted,

14   though, right?

15       A.    Yes.

16       Q.    And you were promoted from a sales associate

17   to a senior sales associate; is that correct?

18       A.    I believe so.  I don't even know if that was

19   even presented to me.  I think it just was implied after

20   a certain amount of time had passed.  So I don't recall

21   any, any formal notification of receiving a promotion

22   from sales associate to senior sales associate.

23           MR. DUKE:  Could you mark this as Exhibit 19,

24   please.

25           (Deposition Exhibit 19 was marked for

MYRICK TANTIADO    April 10, 2008

1              identification.)

2              THE WITNESS:  Thank you.

3              MR. MOSLEY:  Do you have a copy for me?

4              MR. DUKE:  Oh, of course.

5         Q.    Do you recognize this document?

6         A.    I -- it looks familiar.

7         Q.    What is it?

8         A.    This is a promotion from sales associate to

9    senior sales associate.

10        Q.    And this letter also informs you that as of

11   January 1st, 2005, that's when you'll be a senior sales

12   associate, right?

13        A.    Based on this letter, correct.

14        Q.    Or January 3rd, rather.

15        A.    Oh, or -- yes.

16        Q.    And your salary remained the same after

17   becoming a senior sales associate, right?

18        A.    Correct.

19        Q.    But after becoming a senior sales associate,

20   your commission rate was 12-1/2 percent of net sales

21   generated during the previous month, rather than the

22   15 percent that you had previously been receiving,

23   right?

24        A.    That's what this states, so I'm not quite

25   certain of the changes and, and how -- yeah, so based on

78

1        MR. DUKE:  Q.  So you were saying that there

2   was no discernible difference in job responsibilities

3   between sales associate and senior sales associate,

4   right?

5        A.   To my knowledge.  I don't recall any

6   differences between the two positions.

7        Q.   But you understood the appointment to a senior

8   sales associate position from a sales associate position

9   to be a promotion; is that correct?

10       A.   When I was given this title, it was just, it

11  wasn't really like the company made a real big deal

12  about being promoted as senior sales associate.  I think

13  it was a letter sent to me with a change in my business

14  cards, and that was really the extent of the promotion.

15  I don't recall any significance in terms of status or

16  job responsibilities.

17       Q.   After you became a senior sales associate, did

18  you continue to report to Mr. Chase?

19       A.   Yes.

20       Q.   And Mr. Chase remained a general manager at

21  that time?

22       A.   Yes.

23       Q.   After becoming a senior sales associate, did

24  you report directly to anybody else?

25       A.   No.

MYRICK TANTIADO       April 10, 2008

1      Q.    Did your job title subsequently change again?

2      A.    Excuse me.  I believe I was promoted again to

3  the regional manager position.

4            MR. DUKE:  Mark this as Exhibit 20, please.

5            (Deposition Exhibit 20 was marked for

6            identification.)

7            THE WITNESS:  Thank you.

8            MR. DUKE:  Q.  Do you recognize this document?

9      A.    Yes.

10     Q.    What is it?

11     A.    This is a promotion to regional manager for

12  the Bay Area territory.

13     Q.    Now, I notice that it says "Accepted by," and

14  there's a signature blank for you to sign, but you did

15  not sign.  Did you accept the promotion?

16     A.    I accepted it, but I don't know why I did not

17  sign the form.  I'm not sure what my reason behind that

18  was.

19     Q.    Now, if you'll note the letter says that

20  you'll be promoted to regional manager beginning on

21  February 13th, 2006, and this letter is dated

22  March 24th, 2006.  Do you know why the letter is dated

23  about six weeks after the date you were to become

24  regional manager?

25     A.    I believe I was promoted directly from the

82

1    CEO, Mike Whitman, and he just wanted me to start right

2    away.  And this letter was generated after the fact.

3        Q.    So you, in fact, became regional manager on or

4    around February 13th, 2006?

5        A.    I believe so.

6        Q.    After becoming regional manager, you received

7    a raise from $50,000 a year to $75,000 a year, correct?

8        A.    Correct.

9        Q.    And you also became subject to a new

10    commission plan, correct?

11        A.    Correct.

12        Q.    And under this new commission plan, your

13    commissions would be based on regional sales, rather

14    than just your own individual sales, correct?

15        A.    Correct.  As a regional manager, I would not

16    be selling anything.  I was managing a sales force.  So

17    there was no direct commission that I would be able to

18    generate.

19        Q.    So as regional manager, what were your job

20    responsibilities?

21        A.    As regional manager, I was responsible to

22    manage the California sales reps, the reps in

23    California, essentially.

24        Q.    And what did that consist of?

25        A.    It essentially consisted of providing sales

83

MYRICK TANTIADO    April 10, 2008

1    you receive 5,000 shares?

2        A.    At the time, I don't believe it really struck

3    a chord.   I don't believe that that was something that I

4    was really concerned about at the time.

5        Q.    Why not?

6        A.    I just, it just was not something that I had

7    fixated on.   I don't know.   I just, I don't recall, at

8    least.

9        Q.    Who did you report to after you became

10   regional manager?

11       A.    I reported to the new vice-president of sales,

12   John Roache, who was newly hired at that time.

13       Q.    So you no longer reported to Rob Chase; is

14   that right?

15       A.    At that -- when the CEO had asked me to,

16   whether or not I would -- or let me back up.   When the

17   CEO offered me the promotion to regional manager, he

18   gave me the decision to either fire Rob Chase or to keep

19   him on as a sales rep but give me the discretion to do

20   so.

21       Q.    Did Mr. Whitman tell you why Rob Chase should

22   be fired?

23       A.    He did not tell me specifically why I should

24   fire him.   He, he more so suggested that I fire him and,

25   but left that decision to me.

87

MYRICK TANTIADO    April 10, 2008

1    associate position, right?

2        A.    Correct.

3        Q.    So you were regional manager for a little less

4    than two months?

5        A.    I believe that's what it seems to be.

6        Q.    What is your understanding as to why you went

7    from being a regional manager to being a sales associate

8    again?

9        A.    To my best recollection, I believe there were

10    a lot of factors why I wanted to switch back to the

11    senior sales position.

12        Q.    Did you request to be placed in a senior sales

13    associate position again?

14        A.    I believe I did.

15        Q.    Who did you make that request to?

16        A.    To my knowledge, I believe I spoke with John

17    Roache.

18        Q.    And you just testified that there were a

19    number of factors that led you to want to return to a

20    senior sales associate position.  What were those

21    factors?

22        A.    To my best recollection, one of the factors

23    was the fact that I was not really given a proper

24    training platform to manage, to the management position,

25    in my -- at least in my opinion.  One of the other

90

1    A.    I believe that John Roache, having seen how

2    uncomfortable I was with the management position, had

3    realized that I would have been better off in the sales

4    position, and I suggested to him to go back to the

5    senior sales associate position.

6    Q.    And when you returned to the senior sales

7    associate role, your salary returned to $50,000 per

8    year; is that correct?

9    A.    I believe so.

10    Q.    But this time your commission structure was

11    different than what it had been previously when you had

12    been a senior sales associate; is that correct?

13    A.    Yes.

14    Q.    What is your understanding as to why your

15    commission plan was different from what it was when you

16    previously were a senior sales associate?

17    A.    The commission rates had changed based on

18    various factors outlined in the appointment letter.

19    Q.    And those factors that are outlined in the

20    letter are that now there are different commission

21    percentages based on how much you exceed your quota; is

22    that correct?

23    A.    Correct.

24    Q.    And this is the first time that under the

25    commission plan you received different percentages,

92

MYRICK TANTIADO    April 10, 2008

1    commission percentages based on how much you exceeded

2    your quota; is that correct?

3        A.    I believe so, but I'm not, I'm not certain.    I

4    remember the compensation or the commission package was

5    changing, and so I don't know if, if it, this was the

6    most recent time it had changed or if there were changes

7    in the commission rate prior to this.    I don't recall.

8        Q.    Do you have an understanding as to why PMI

9    revised its commission plan to require quotas for higher

10   commission rates?

11       A.    I believe that Power Medical Interventions

12   wanted to motivate the sales force to sell more.

13       Q.    Did PMI apply, you know, the same or similar

14   commission plan to its entire sales force, as far as you

15   know, at this time?

16       A.    I don't recall.    Possibly.

17       Q.    What was your quota?

18       A.    I don't recall.

19       Q.    Do you recall whether if, from the time that

20   you returned to the senior sales associate role until

21   your employment with PMI terminated, whether your quota

22   changed?

23       A.    I, I don't know whether it changed or not.    I

24   don't recall.

25       Q.    After you returned to a senior sales associate

MYRICK TANTIADO    April 10, 2008

1    A.    No, not to my knowledge.

2    Q.    After you became, or rather, after you

3    returned to the senior sales associate position, who did

4    you report to?

5    A.    I reported to Rob Chase.

6    Q.    Did you continue to report to John Roache?

7    A.    No.

8    Q.    What was Rob Chase's job title after you

9    returned to the senior sales associate role?

10    A.    Regional manager.

11    Q.    So you and Mr. Chase switched jobs again?

12    A.    Correct.

13    Q.    After returning to the senior sales associate

14    position, did you report directly to anyone else other

15    than Mr. Chase?

16    A.    No.

17    Q.    After resuming your senior sales associate

18    position in 2006, in April 2006, what was your

19    understanding of your job performance?

20    A.    Great.

21    Q.    Did anyone express any concern about your

22    sales numbers?

23    A.    No.  Not to my knowledge.

24    Q.    In approximately May of 2006, did you have a

25    conversation with Mr. Chase at an American Society of

95

1    Bariatric Surgeons meeting where you discussed problems

2    that you were having selling PMI's stapler product?

3         A.    I don't recall the date, whether it was May or

4    later in the year, June, July, but I do recall having a

5    conversation with Rob Chase at the American Society of

6    Bariatric Surgery meeting.

7         Q.    During this conversation, did you and

8    Mr. Chase discuss your sales performance?

9         A.    I believe so.

10        Q.    Tell me what Chase said and what you said in

11   this conversation.

12        A.    I recall Rob asking me whether or not I would

13   be able to sell the products and make quota.  And I told

14   him that I would not be able to sell the circular

15   stapling line any longer because of my concern with the

16   stapling line's effectiveness, and that he was concerned

17   whether I would be able to hit my number, or at least

18   obtain a certain amount of revenue for the months to

19   come.  And I told him that I didn't feel that I would be

20   able to hit my number with the limited amount of

21   stapling product that I would have to sell in order to,

22   you know, compensate for the items that I would not be

23   able to sell.  And I think I had mentioned something to

24   the effect of, that he -- I think he had said something

25   like, "I don't think, I don't think they would want to

1    hear what you're saying." And, "I don't think" -- or

2    something to the effect that, "They would not be happy

3    with, with what you're saying."

4         And I told him that, you know, that I just

5    couldn't sell the circular stapling product line, and if

6    that meant that I would be on -- that I may possibly be

7    terminated, then, you know, that's, that's their

8    prerogative. And he, he said, "Okay, well, that's what

9    I'll tell them." And that's the gist of the

10   conversation.

11        Q.   So just to kind of go through that in a little

12   detail, break it down.

13        Mr. Chase told you that you needed to meet

14   your monthly quota, right?

15        A.   I, I think he -- it wasn't really him saying

16   that I needed to meet my monthly quota, because we had

17   always had quotas, but whether we made the quota or not,

18   we were always striving to try to get some type of

19   revenue for that month. So whether we made the quota or

20   not, there was always some sort of effort to make or, or

21   reach a certain number. So he had suggested that I try

22   to make at least X amount of money, or revenue, for the

23   upcoming, excuse me, for the upcoming months.

24        Now, I don't believe that it was the quota

25   that he was asking me to hit, but the, a more manageable

97

1  number that may have been less than the actual quota.

2  And I think he said something like, you know, "You just

3  want to make sure that they have -- that, you know, they

4  are, you know, that you're making, you know, some sort

5  of progress in hitting your number."

6      Q.    And in this conversation, you told Mr. Chase

7  that you were uncomfortable selling circular stapling

8  products, the PMI circular stapling product line?

9      A.    Correct.

10      Q.    What was the source of your discomfort with

11  PMI's circular stapling products?

12      A.    I've had, at that point, various surgeons

13  through the course of my employment at Power Medical,

14  tell me that they have had issues, various different

15  types of issues with the circular stapler.  Some, in

16  fact, have caused patient harm.  And there were actually

17  some accounts that banned the Power Medical or

18  SurgAssist product line from their hospital because they

19  deemed it unsafe.

20      Q.    Can you tell me all of the reports of products

21  with the SurgAssist product line that you received from

22  customers that you were calling on?

23      A.    Could you rephrase that question?

24      Q.    Sure.  You just testified that you, that

25  surgeons had told you that there were problems with the

98

MYRICK TANTIADO    April 10, 2008

1    incident happen to him, where he had used the product

2    before I was hired; I asked whether or not he would give

3    it another chance.  He used the circular stapler, had an

4    incident, and he vowed never to use the stapler again.

5        Q.    Anyone else?

6        A.    At this point, those are the surgeons that I

7    can recall at this point, but I, I'm sure there were

8    other surgeons that I just have not, that I just can't

9    remember at this point --

10       Q.    When you --

11       A.    -- that --

12       Q.    Sorry.

13       A.    Oh.  I was just going to say that had similar

14   experiences with the stapler, where they either vowed

15   not to use the stapler again or had issues with the

16   stapler and whether or not it was safe to use.

17       Q.    When you received these reports, what did you

18   do?

19       A.    I believe I filled out an ICR report to

20   document most of these, at least I believe I documented

21   all of these reports, to the best of my knowledge, and

22   sent, if possible, sent the products back to the

23   corporate office for further evaluation.

24             MR. DUKE:  Can we mark this as Exhibit 22.

25             (Deposition Exhibit 22 was marked for

101

MYRICK TANTIADO     April 10, 2008

1          identification.)

2          THE WITNESS:  Thank you.

3          MR. DUKE:  Q.  Do you recognize these?

4     A.   Yes.

5     Q.   What are they?

6     A.   These are ICR, or Initial Contact Reports.

7     Q.   And these are the ICRs that you submitted

8  during the course of your employment with PMI?

9     A.   I believe so.

10    Q.   To whom at the company did you submit the

11 ICRs?

12    A.   I don't recall their names.  I think it was

13 Allyson Junod, Greg Jones, and Rob Chase.  I'm not

14 certain if those names are correct.  But --

15    Q.   Sorry.  Continue.

16    A.   But I think, but I believe it was the QA

17 department that received the Initial Contact Reports.

18    Q.   By QA, you mean quality assurance?

19    A.   Correct.

20    Q.   Who is Allyson Junod?

21    A.   I think she was one of the quality assurance

22 persons that handled the ICR reports.  I, I'm not sure

23 if that's her name.  From what I recall.

24    Q.   Who is Greg Jones?

25    A.   Greg Jones, I believe, was in charge of QA at

                                                        102

MYRICK TANTIADO      April 10, 2008

```
 1        A.    So when I had the product or obtained the
 2   product that was defective, I would package it in a
 3   biohazard package and ship it to the, I believe it was
 4   the quality assurance group.  I, I don't recall who
 5   actually received the product.  But a group in PMI would
 6   decontaminate the product.  I believe she would, she
 7   would have it sent to some of the engineers.  From the
 8   best of my recollection, the engineers would break the
 9   product down and try to figure out what was wrong with
10   it.
11        Q.    Other than through --
12        A.    Then --
13        Q.    I'm sorry.
14        A.    I was just, then they would report those
15   defects to QA; QA would send me the response.
16        Q.    Other than through ICRs, were there any other
17   ways that you notified the company of product problems?
18        A.    Not to my knowledge.  The ICR was really the
19   method of notifying the company of any suspect product.
20        Q.    Did you ever relay any concerns about any of
21   PMI's product lines to Greg Jones other than through
22   ICRs?
23        A.    I believe I may have had a couple of
24   conversations with Greg Jones.  I vaguely remember
25   having spoken with him on one or two occasions.
```

                                                         104

MYRICK TANTIADO    April 10, 2008

1    Mr. Mintun?

2        A.    I don't recall what year, whether it was, in

3    fact, 2005, but we did have conversations.

4        Q.    Did you ever relay any concerns about any of

5    PMI's product lines to Michael Whitman?

6        A.    Never.  I --

7        Q.    Who was Pat Holmes?

8        MR. MOSLEY:  Well, he was in the middle of --

9    you have to let the witness answer the question.

10       MR. DUKE:  I did.  He answered the question.

11       MR. MOSLEY:  He said "and," and then you

12   started your new question.

13       MR. DUKE:  Because he answered the question.

14       MR. MOSLEY:  You can answer the question.

15       MR. DUKE:  No, no.

16       MR. MOSLEY:  You can answer the question.

17       MR. DUKE:  Excuse me.  This is my deposition.

18       MR. MOSLEY:  You can't cut him off.  I'm not

19   going to let you cut him off or we're ending the

20   deposition now.  You've cut him off in mid sentence, and

21   if you do that again, the deposition is over.

22       You get to answer that question.

23       MR. DUKE:  No.

24       MR. MOSLEY:  If you have more to say, you get

25   to answer it.

111

MYRICK TANTIADO    April 10, 2008

1  call him to find out the most recent updates on what was

2  shipped that was defective and what was not.

3      Q.   How about Maurice Pritchett; same type of

4  conversations as with Mr. Mehl and Mr. Connolly?

5      A.   Similar, but not as much.

6      Q.   Did you ever relay any concerns about any of

7  PMI's product lines to the FDA?

8      A.   No.

9      Q.   Did you ever relay any concerns about any of

10  PMI's product lines to any other government agency?

11      A.   No, I was afraid of getting fired if I would

12  report anything to anyone outside the company.

13      Q.   Did you ever relay any concerns about any of

14  PMI's product lines to anyone else, you know, other than

15  the people who you've testified already about?

16      A.   I -- there were other sales reps that I may

17  have talked with that I don't remember.  I'm sure that

18  I've spoken with many other people about, within the

19  organize -- within PMI about the issues.  I don't

20  remember them off the top of my head, remember their

21  names off the top of my head.  But I don't believe I had

22  spoken with anyone outside of PMI again for fear of

23  being fired.

24      Q.   Isn't it true that you were responsible for

25  selling products other than PMI's circular stapling

1    Q.    And you also testified that at least as a

2    formal matter, there's one quota that could be satisfied

3    by selling any combination of PMI products, correct?

4    A.    Correct.  And, however, if we did not sell the

5    circular stapler, then we were at a disadvantage because

6    that was the market; that was where we had the most

7    business.

8    Q.    Do you believe that PMI cared one way or the

9    other where your sales came from, as long as you were

10    making sales?

11    A.    I don't believe that Power Medical, PMI cared

12    whether we sold one line or the other.

13    Q.    Now, going back to your conversation with Mr.,

14    Mr. Chase at the American Society of Bariatric Surgeons.

15    A.    Can I just --

16    Q.    Oh, certainly.

17    A.    -- back up to that last question?

18         Can you . . .

19         MR. MOSLEY:  Give us both the question and the

20    answer back.

21         (Record read by the reporter as follows:

22         Q.  Do you believe that PMI cared one way

23         or the other where your sales came from,

24         as long as you were making sales?

25         A.  I don't believe that Power Medical,

123

MYRICK TANTIADO        April 10, 2008

1    it shows.  We'll move on.

2            At some point you got fired, right?

3        A.    Yes.

4        Q.    When did you get fired?

5        A.    I don't recall the exact date.

6        Q.    Did anyone tell you why you got fired?

7        A.    Rob Chase had spoken with me when he got back

8    from his managers' meeting and told me that I was fired.

9    I don't recall if he explained specifically what had

10   happened at the managers' meeting, but he did tell me

11   that I was fired.

12       Q.    Did Mr. Chase give you a reason for why you

13   were fired?

14       A.    I believe that the reason, from the best of my

15   knowledge, was because I told him I did not want to --

16   that I could not, would not feel comfortable selling the

17   circular stapler any longer.

18       Q.    And did Mr. Chase tell you that?

19       A.    I don't recall him specifically stating that,

20   but I believe that that was the reason.  I don't recall

21   him specifically stating that he had a conversation with

22   Mike Whitman explaining that, but I -- I don't

23   specifically recall what Rob Chase had said when he

24   fired me.

25       Q.    Did anyone else tell you why your employment

                                                          127

MYRICK TANTIADO    April 10, 2008

1    A.    Correct.

2    Q.    After your employment terminated, you

3  submitted quite a few expense reports to Mr. Chase; is

4  that correct?

5    A.    Correct.

6        MR. DUKE:  This is going to be a bit of a

7  mess, and I apologize in advance.

8        Can you mark this as Exhibit 26.

9        (Deposition Exhibit 26 was marked for

10        identification.)

11        THE WITNESS:  Thank you.

12        MR. DUKE:  Q.  Take your time to flip through

13  them first.

14        MR. MOSLEY:  Well, there's a lot of them.  You

15  want him to look through them all, or . . .

16        MR. DUKE:  Well, just to familiarize.

17        MR. MOSLEY:  The general nature of what they

18  are?

19        MR. DUKE:  Exactly.

20    Q.    Do you recognize all these pages --

21    A.    Yes.

22    Q.    -- in Exhibit 26?

23        What are they?

24    A.    These are expense forms and receipts that I

25  had submitted.

MYRICK TANTIADO        April 10, 2008

1      A.    Yes.

2      Q.    Isn't it true that the University of

3  California at San Francisco Medical Center contacted you

4  while you were still employed by PMI because it wanted

5  to return some products that it had purchased?

6      A.    UCSF did want to attempt to return some

7  product; however, I was in the process of working at

8  finding other options for them since there were a few

9  surgeons that still wanted to evaluate certain product

10  lines.

11          MR. DUKE:  Can you mark this as Exhibit 29,

12  please.

13          (Deposition Exhibit 29 was marked for

14          identification.)

15          THE WITNESS:  Thank you.

16          MR. DUKE:  Q.  Do you recognize this e-mail?

17      A.    Yes.

18      Q.    What is it?

19      A.    This is an e-mail from the senior buyer at

20  UCSF Medical Center that states that the evaluation at

21  UCSF has ended and they would like to return the items

22  for full credit.

23      Q.    So Brian Leonard is the, I believe you said,

24  senior buyer; is that right?

25      A.    That was his title at this time.

143

1    Q.    Did you respond to this e-mail?

2    A.    I don't know whether I had spoken with him

3    live or if I had replied to his e-mail, but I had

4    responded to him in some form.

5    Q.    What did you -- can you state the substance of

6    your response?

7    A.    I don't recall the exact conversation because

8    I had many conversations with Brian along with, along

9    with other people within UCSF that had, or were a part

10    of the evaluation process, and all were within the

11    materials management department of UCSF that dealt with

12    products of this sort.

13    Q.    Now, just to clarify, you testified, I

14    believe -- and correct me if I'm wrong -- that UCSF

15    wanted to return product but you wanted to try and

16    perhaps sell them an alternative product.  Does that

17    capture . . .?

18    A.    No.

19    Q.    When you were talking about the reimbursement

20    offset.  If you could -- I guess I'm a little hazy

21    there.

22    A.    I'm not sure.

23    Q.    When, when you received this e-mail from

24    Mr. Leonard, why didn't you just process the return?

25    A.    The reason I did not process the return --

144

1    there were probably -- I'm trying to recall exactly what

2    had happened.  But to the best of my knowledge, there

3    probably were various reasons why I did not want to

4    process this return, one being UCSF is probably one of

5    the biggest accounts in Northern California.  And in

6    order to get an evaluation, just an evaluation into this

7    account, it took over a year, or it can take up to a

8    year just to get your foot in the door.  So when I was

9    able to bring the product in for evaluation, I wanted to

10   extend the evaluation and continue having the surgeons

11   try different product in order to have them keep the

12   system in there, keep the system in until we had other

13   products we can show them, since if they did remove the

14   product, it would have been a potential year-long wait

15   before we would have been able to evaluate any other

16   product that we may have come out with down the road.

17   So I tried to lobby the, or rally the support of various

18   surgeons at UCSF to request that we continue keeping the

19   SurgAssist product at UCSF.  That was one of the main

20   reasons, from the best of my knowledge, that I wanted --

21   that I did not want to have the product returned.

22       Q.   Are there any other reasons you did not want

23   to have the product returned?

24       A.   It's actually kind of a -- actually, the first

25   reason was really the reason why I didn't want it

Merrill Legal Solutions
(800) 869-9132

1      A.    To the best of my knowledge, that was never

2    discussed.  I don't think there was any, anything

3    clearly stated regarding whether or not I would be, or

4    what the consequences would be for having product

5    returned within 60 days, or if there were any

6    consequences at all.  So I, I don't know what the return

7    policy was because I don't think it was ever clearly

8    stated.

9      Q.    Returning to Miss Esposito's August 18th,

10   2006, letter to you, she indicated that after the

11   set-off that PMI was doing based on the UCSF return,

12   that this left $2,937.68 in reimbursement remaining.

13   Did you receive a check from PMI for $2,937.68?

14     A.    I, I don't recall whether it was for the

15   specific amount.  I, I'll have to check, you know, my

16   pay stubs.  But from the best of my knowledge, I believe

17   this was sent to me after some time had passed.

18     Q.    A check for the reimbursement amount, is that

19   what you mean, being sent to you after some time had

20   passed?

21     A.    A check for the remaining expense

22   reimbursement in the amount of $2,937.68 at some time

23   what may have been received to me, or it may have been

24   sent to me.  Excuse me.  I just, I don't recall.  I

25   think it was sent to me after some time, but I

MYRICK TANTIADO    April 10, 2008

1      A.    They are responses --

2      Q.    During your employment with PMI -- I'm sorry?

3      A.    I was just saying they are responses, but I do

4   not know what they, what those particular codes mean.

5      Q.    During your employment with PMI, did you ever

6   tell anyone at PMI that it was violating 21 U.S.C.A.

7   351(a)?

8      A.    No, I did not.

9      Q.    During your employment with PMI did you ever

10  tell anyone at PMI that it was violating related FDA

11  regulations related to 21 U.S.C. 351(a), including 21

12  CFR 803 and 21 CFR 820, et seq.?

13     A.    I do not understand these codes, so I did not

14  discuss these codes with anyone.

15     Q.    In your answer to interrogatory number 6, you

16  say, "Defendant continued to demand that its salespeople

17  sell these dangerous, nonconforming products to

18  customers such as doctors and hospitals for use on

19  patients."

20          What does "nonconforming" mean?

21     A.    My definition of "nonconforming", I'm not --

22  I'm not certain what "nonconforming" specifically means,

23  but that the product should not be used if it does not

24  work.  That's . . .

25     Q.    And answer to interrogatory number 6 also

187

**EXHIBIT 3**

 **Power Medical Interventions™**

110 Union Square Drive New Hope, PA 18938
Phone: 1-866-POWERMED
Fax: 267-775-8122

July 1, 2004

Myrick Tantiado
233 Winding Way
San Francisco, CA 94112

<u>**PERSONAL AND CONFIDENTIAL**</u>

Dear Myrick:

I am pleased to extend to you this offer of employment with Power Medical Interventions, Inc. as a Sales Associate for the San Franscisco, CA territory, commencing on July 6, 2004. You will report to Rob Chase, General Manager.

Your responsibilities will include, but are not limited to, achieving annual revenue objectives, executing a regional sales plan, surgeon education and training and other assignments which are yet unanticipated but may become priorities as our business progresses.

You shall be paid on a salary basis at an annual rate of $50,000, to be paid bi-weekly. As a regular, full-time employee you are eligible to participate in the employee benefit plans which PMI offers to its employees. These programs at present consist of life insurance, health and dental coverage, long-term and short-term disability coverage and 401(k). Your vacation will be earned and accrued on a monthly basis at .833 days per month, totaling ten days per year. Your medical and dental benefits will be effective August 1, 2004 and there is a six-month waiting period to join the 401(k) Plan. These plans may, from time to time, be amended or terminated with or without prior notice.

You will be eligible to participate in our monthly commission plan beginning immediately. The commission will be paid monthly at 15% of net sales, based on sales generated from the previous month. The Company reserves the right to periodically reassess the commission percentage. You will be reimbursed for all reasonable business expenses as outlined in the employee handbook. You will also be eligible for a $3,000.00 draw against commission for the first three months of employment. As a member of the field sales selling organization you will also receive a monthly car allowance of $600.00 to apply to car and insurance expenses.

Further, it is our intention after six months of employment to recommend to the Board of Directors that you be granted a non-qualified stock option. As a condition of employment, you understand you will forfeit any rights to these stock option awards should you voluntarily



EXHIBIT
Tantiado
3
4-10-08

PMI 000021

terminate employment with the company prior to your first anniversary date of your joining the company.

Your employment at all times will be at will, meaning that you are not being offered employment for a definite period and that either you or PMI may terminate the employment relationship at any time for any reason.

As a condition of your employment, you will be required to sign the attached Non-disclosure, Non-competition and Assignment of Inventions Agreement.  In addition, the Immigration Reform and Control Act requires employers to verify employment eligibility and identity of new employees.  On your first day of employment, you must provide us with appropriate documents to establish your eligibility to work in the United States (i.e. Social Security Card and Drivers' License, or U.S. Passport).  We will not be able to employ you if you fail to comply with this requirement.

PMI maintains a smoke-free, drug-free workplace policy and supports equal employment opportunities for all of its employees.

In making this offer, PMI understands that you are not under any obligation to any former employer or any person, firm, or corporation which would prevent, limit, or impair in any way the performance by you of your duties as an employee of PMI.

This offer of employment is contingent upon the results of your background check and your employment may be terminated based on any false or negative information that may be revealed during this process.

Power Medical is an exciting and dynamic place to work. We are developing a product that will revolutionize the medical device field, and already have solid endorsements from both surgeons and the financial community.  I look forward to you being a part of that excitement.

This offer will expire at 5:00 p.m. EST on July 2, 2004.  Please indicate your acceptance of this offer by signing and returning this offer letter, the attached Non-disclosure, Non-competition and Assignment of Inventions Agreement, and the attached Employee Release form.  Please return the documents to:

    PMI
    HR Dept.
    110 Union Square Drive
    New Hope, PA 18938

Myrick, we are looking forward to having you officially join the team!

Sincerely,                                    Accepted:

Rita Esposito                                  Myrick Tantisdo      Date 7/2/04
Human Resource Manager

PMI 000022