# EXHIBIT B

```
1              UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
3
4    MYRICK TANTIADO, an individual,)
                                    )
5            Plaintiff,             )
                                    )
6    vs.                            )   No. C 07-02874 CRB MED
                                    )
7    POWER MEDICAL INTERVENTIONS, a )
     Pennsylvania corporation, and  )
8    DOES ONE through FIFTY,        )
     inclusive,                     )
9                                   )
             Defendants.            )
10   _____)
```

**CERTIFIED COPY**

```
                    DEPOSITION OF

                    ROBERT CHASE

                Monday, December 17, 2007


REPORTED BY:  TINA MARIE VELASQUEZ
              C.S.R. NO. 10072



              BONNIE L. WAGNER & ASSOCIATES
                COURT REPORTING SERVICES
                    41 SUTTER STREET
            SAN FRANCISCO, CALIFORNIA  94104
                     (415) 982-4849
```

```
 1        BE IT REMEMBERED that pursuant to Notice of
 2   Taking Deposition, and on Monday, December 17, 2007,
 3   commencing at the hour of 10:00 a.m., thereof, at the Law
 4   Offices of Mosley & Gearinger, 825 Van Ness Avenue, 4th
 5   Floor, San Francisco, California 94109, before me, TINA
 6   MARIE VELASQUEZ, a Certified Shorthand Reporter in and for
 7   the State of California, personally appeared
 8                         ROBERT CHASE,
 9   called as a witness by the Plaintiff, who, being by me
10   first duly sworn, was thereupon examined and testified as
11   is hereinafter set forth.
12                         ---oOo---
13
14   APPEARANCES:
15        Law Offices of MOSLEY & GEARINGER, LLP, 825 Van
16   Ness Avenue, 4th Floor, San Francisco, California
17   94109-7837, represented by STEPHEN HENRY, Attorney at Law,
18   appeared as counsel on behalf of the Plaintiff.
19        Law Offices of BARTKO, ZENKEL, TARRANT & MILLER,
20   900 Front Street, Suite 300, San Francisco, California
21   94111, represented by ALYSON L. HUBER, Attorney at Law,
22   appeared as counsel on behalf of the Defendant.
23
24        Also present:  MYRICK TANTIADO
25                         ---oOo---
```

1  concern for selling some of the products.
2      Q.   And do you recall which products he was showing
3  concern about selling?
4      A.   I seem to recall it was the circular stapler
5  products.
6      Q.   And what concerns did he convey to you?
7      A.   I think he felt a lack of confidence in the
8  product to be able to go and -- you know, he didn't have a
9  comfort level in selling the product because he didn't feel
10 like it would perform 100 percent of the time.
11     Q.   And how did he explain that lack of performance?
12     A.   I don't recall an explanation of a lack of
13 performance, other than more of a lack of confidence in
14 knowing that the product was going to work 100 percent of
15 the time.
16     Q.   Have you and Mr. Tantiado talked about this lack
17 of confidence in the performance of the circular stapler
18 prior to this meeting?
19          MS. HUBER:  Objection; misstates his testimony.
20          THE WITNESS:  I don't recall a specific
21 conversation prior to that.  I think that the -- you know,
22 other conversations that we had previously would have been
23 around difficulties around just getting the products -- the
24 normal selling process of getting the products into the
25 hospital.

```
 1           MR. HENRY:  Q.  This conversation that you had
 2   at the meeting of the Society of Bariatrics Surgery, what
 3   else do you recall of the conversation?
 4        A.   I recall talking about the need to meet certain
 5   minimum amount of sales on a monthly basis with all of the
 6   products that we represented for Power Medical.
 7        Q.   And what did Mr. Tantiado say to that?
 8        A.   I think that he was in agreement that we had to
 9   sell a certain -- we had to continue to produce and sell a
10   certain amount for the company even though there was -- in
11   terms of total sales.
12        Q.   When you say, "total sales," what are you
13   referring to?
14        A.   All of the product categories.
15        Q.   Did Mr. Tantiado convey to you that he was unable
16   to sell the circular stapler?
17        A.   I don't recall him saying "unable," but I recall
18   him saying that he was uncomfortable in selling that
19   product.
20        Q.   And why did he say he was uncomfortable selling
21   the circular stapler?
22        A.   Because he felt that -- he didn't have confidence
23   that it would work 100 percent of the time.
24        Q.   And how did you respond to that comment?
25        A.   I believe that I said, "I understand your concern
```

1  and yet what we still need to do is meet a certain minimum
2  sales for the company. Even if you're uncomfortable with
3  that product, then focus on the other products," I seem to
4  recall.
5      Q.  Did you convey to Mr. Tantiado any opinion
6  regarding how the company's management would react to his
7  comments?
8      A.  No.
9      Q.  Did you tell him that that's not what they wanted
10 to hear?
11         MS. HUBER:  Objection; leading.
12         THE WITNESS:  No.
13         MR. HENRY:  Q.  Do you recall anything else
14 about the conversation that you had with Mr. Tantiado at
15 the meeting of the Society of Bariatric Surgery?
16     A.  It was -- as I recall, the conversation was, you
17 know, we need to meet the minimum sales for the
18 territories; so that if he didn't focus on those products,
19 that he needed to focus on others. It really wasn't my
20 concern where those sales came from, as long as we met kind
21 of a minimum amount of sales.
22     Q.  Prior to this time, had any other -- did you
23 oversee any other salespeople besides Mr. Tantiado?
24     A.  Yes.
25     Q.  How many at that time, 2006?

1  you that a Power Medical product had harmed a patient?
2      A.  None.  None that come to mind, no.
3      Q.  Do you have any recollection of discussing the
4  potential harm to patients by Power Medical products during
5  your conversation with Mr. Tantiado at the meeting of the
6  Society of Bariatric Surgeons?
7      A.  No, no.
8      Q.  After you have your meeting with Mr. Tantiado at
9  the Meeting of the Society of Bariatric Surgeons in 2006,
10 did you convey anything that he told you to anyone at Power
11 Medical?
12     A.  No.
13     Q.  Who was your direct supervisor?
14     A.  During which timeframe?
15     Q.  2006.
16     A.  I think that there could have been a couple
17 different people during that year.  Actually, a few
18 different people.  I believe the year started with Keith
19 Mintun, and then it went to John -- I don't have his last
20 name, but you probably have record of him.  He was the VP
21 of sales.  And then eventually it was Steve Mehl.
22     Q.  Do you recall who your direct supervisor was at
23 the time that you met with Mr. Tantiado at the meeting of
24 the Society of Bariatric Surgeons?
25     A.  I believe that the gentleman that had -- John --

1   his last name is escaping me.
2       Q.   Roche?
3       A.   John Roche, yes.  John Roche had left or been
4   terminated, I believe, at that time.  And there was no vice
5   president of sales in place.
6       Q.   Who were you reporting to?
7       A.   So that -- and I'm not sure of the timing on
8   that, whether John was still there at that meeting or not.
9   But shortly thereafter or around that time, he was
10  replaced, and they didn't have anybody -- actually, he
11  wasn't replaced.  They didn't have anybody to replace him
12  just yet.  And so Pat Holmes and Mike Whitman were kind of
13  overseeing the sales organization.
14      Q.   What was Pat Holmes' title?
15      A.   I believe he was -- I don't recall the exact
16  title, but I think he acted as kind of a director of
17  operations or something like that.
18      Q.   After your conversation with Mr. Tantiado at the
19  Meeting at the Society of Bariatric Surgeons, did you
20  discuss that meeting with Mr. Holmes or Mr. Whitman?
21      A.   No.
22      Q.   After that meeting with Mr. Tantiado at the
23  Meeting of the Society of Bariatric Surgeons, did you
24  discuss Mr. Tantiado in any way with Mr. Holmes or
25  Mr. Whitman?

1  A. There was a manager's meeting that took place in
2  summer of 2006. I don't recall the exact date, but there
3  was -- as part of the manager's meeting, there was a review
4  of each region and then each sales representative within
5  the region.
6  Q. And who participated in that review?
7  A. That was myself, Pat Holmes and Mike Whitman.
8  Q. Were there other regional managers present?
9  A. Yes.
10 Q. Who were the other regional managers?
11 A. Maurice -- there were other regional managers
12 that attended the meeting. Maurice Pritchard, Steve Mehl,
13 Keith Mintun was there, and then there was managers from
14 the eastern region as well.
15 Q. And did each regional manager have individual
16 meetings with Mr. Holmes and Mr. Whitman?
17 A. Yes.
18 Q. And what did you do in your meeting with
19 Mr. Holmes and Mr. Whitman at this manager's meeting in the
20 summer of 2006?
21 A. I reviewed the -- kind of the state of the region
22 in terms of what the state of the business was basically;
23 we had discussions around that.
24 Q. Anything else?
25 A. We did kind of a review by territory, by

```
 1  personnel.
 2      Q.   Anything else?
 3      A.   No.  I think that was it.
 4      Q.   Was there any discussion of product performance
 5  issues?
 6      A.   No.
 7      Q.   Any discussion of product performance failures?
 8      A.   No.
 9      Q.   Any discussion of difficulty in selling certain
10  products?
11      A.   No.
12      Q.   Any discussion regarding difficulties related to
13  the sale of the circular stapler?
14      A.   Not that I recall.
15      Q.   Was Mr. Tantiado discussed?
16      A.   Yes.
17      Q.   What was said about Mr. Tantiado?
18      A.   I think that they wanted to know kind of what his
19  -- you know, how he was doing, given the changes that had
20  took place during the first quarter of the year, moving
21  from sales representative to manager to sales
22  representative.
23      Q.   What did you say?
24      A.   At the time, I recall letting them know that I
25  thought that Myrick wasn't -- I didn't think that maybe he
```

1  was fully engaged in selling the products, selling all of
2  the products.
3      Q.   How did you describe that?
4      A.   How did I describe that?
5      Q.   What did you say about his not being fully
6  engaged in selling all of the products?
7      A.   I believe that that's how I communicated it.  I
8  don't know if those were the exact words, but that's --
9  that that was -- that I felt like there was opportunities
10 there to do more from a sales perspective than -- you know,
11 and engage more than what he was currently exhibiting or
12 doing.
13     Q.   Did you discuss with Mr. Holmes and Mr. Whitman
14 Mr. Tantiado's reluctance to sell certain product lines?
15     A.   No.
16     Q.   Why not?
17     A.   Well, that didn't come to -- it wasn't -- it
18 didn't come to the forefront of my mind at those
19 discussions.  I felt that there was opportunity to perform
20 and meet kind of the overall sales that were required,
21 regardless of whether he wanted to sell the circular
22 stapler or not, but there was enough opportunity in the
23 territory.  So I didn't see that as being a detriment to
24 him meeting his sales objectives.
25     Q.   And did you discuss that with Mr. Holmes and

```
 1  Mr. Whitman?
 2       A.   No.
 3       Q.   Did you and Mr. Holmes and Mr. Whitman go through
 4  each product line as you discussed Mr. Tantiado's sales?
 5       A.   No.
 6       Q.   What did Mr. Holmes and/or Mr. Whitman ask you
 7  about Mr. Tantiado?
 8       A.   I think the question that came up was, you know,
 9  "How is he doing?  What's his state of mind now with all
10  these changes?  What's going on with him?"
11       Q.   And how --
12       A.   And those are probably not his exact words, but
13  that's what I recall as being kind of the general
14  discussion.
15       Q.   And who was asking that?
16       A.   I believe that was Mike Whitman.
17       Q.   And what was your response?
18       A.   My response was, I didn't feel like -- that
19  Myrick was engaged in the job, that he had -- didn't show
20  the desire that he once had in terms of going out and
21  getting the sales.
22       Q.   And did you seek to explain that in any way?
23       A.   I don't think it took much more than that, that
24  level of explanation.  Mr. Whitman's kind of a -- doesn't
25  need a lot of -- he's kind of a -- doesn't need a lot of
```

1  explanation. I don't think he needed more than what I had
2  given him, what I expressed to you here.
3      Q. So what did Mr. Whitman say after you gave that
4  explanation?
5      A. He said that -- both came to the conclusion that
6  we needed to let Myrick go.
7      Q. Did they explain that conclusion at all?
8      A. No. Not that I recall.
9      Q. Where did the manager's meeting take place?
10     A. It was in Kohler, Wisconsin.
11     Q. In a hotel?
12     A. Yeah, it was a hotel conference facility. The
13 American Club.
14     Q. How long was the conference?
15     A. I believe it was a few days, something like that.
16     Q. And what took place over those few days?
17     A. There was general business meetings about the
18 company, individual one-on-one meetings, which I described
19 to you just a minute ago, there was some golf that was
20 played on one day.
21     Q. And how many people attended?
22     A. I'd say there was probably 15 to -- maybe 15, 20,
23 at the max.
24     Q. So it was Power Medical executives from Langhorne
25 and the regional managers?

```
 1        A.   Yes.
 2        Q.   Anybody else?
 3        A.   Pat Holmes -- well, he would be from Langhorne.
 4   I think that's it.  I can't recall anybody else.
 5        Q.   Were there any discussions about the products
 6   during the two days?
 7        A.   There was discussions about products.  Mostly
 8   future products.
 9        Q.   Any discussion regarding the existing products?
10        A.   None that -- they may have been discussed, but no
11   conversations jump out at me or presentations that were
12   given.
13        Q.   Did you have any discussions with other regional
14   managers regarding product performance issues?
15        A.   Not that I recall, no.
16        Q.   Did anybody from quality assurance at Power
17   Medical attend the meeting?
18        A.   I don't believe so.  Although I'm not positive on
19   that, but I don't recall anybody from quality assurance.
20        Q.   During your time at Power Medical, did you ever
21   communicate with anybody at quality assurance for any
22   reason?
23        A.   I can't recall specifics.  I'm sure I talked to
24   people in that department before, so ... I believe the
25   person that headed it up was Greg Jones, and I know I met
```

```
 1       A.   Not that I've been involved with.
 2       Q.   Have you heard of one occurring?
 3       A.   No.
 4       Q.   When Mr. Whitman instructed you to terminate
 5  Mr. Tantiado, do you recall what specifically he said?
 6            MS. HUBER:  Objection; mischaracterizes his
 7  testimony.
 8            MR. HENRY:  Let me back up.
 9       Q.   Did Mr. Whitman instruct you to terminate
10  Mr. Tantiado?
11       A.   Yes.
12       Q.   What were his words, to the best of your
13  recollection?
14       A.   I don't recall the exact words, but basically it
15  was, you know, he communicated that we needed to let him go
16  and that we -- I believe it was to -- I don't recall if the
17  plan was to rehire for that position or, you know, whether
18  he said, "let him go and find somebody else for that
19  position or" -- but basically that the direction was given
20  to terminate his employment.
21       Q.   Did you hire anybody for Mr. Tantiado's position?
22       A.   I don't believe that I did, no.
23       Q.   At that meeting, which Mr. Whitman directed that
24  Mr. Tantiado be terminated, did he direct that you
25  terminate anybody else?
```

1    A.    There would have been a document put out each
2  year that stipulated what the commissions were for the
3  sales representatives.  That's usually done during the
4  first part of the year.
5    Q.    Besides stating what the percentage was, did the
6  document say anything else?
7    A.    I think that usually it's -- I don't recall a
8  specific document, but typically they are an overview of
9  all the compensation that a sales representative would get,
10 including base salary, company benefits, commission.  Some
11 years, it's a more elaborate document than others.
12   Q.    Was there anything else describing the commission
13 arrangement besides that document that you just described?
14       MS. HUBER:  Objection; calls for speculation.
15       MR. HENRY:  Q.  To your knowledge.
16   A.    No, not that I recall.
17   Q.    At the time that you were managing Mr. Tantiado,
18 did Power Medical have any policy with regard to the
19 effective returns of product on a sales representative's
20 commission?
21   A.    Anything in writing, you say?
22   Q.    Any policy.
23   A.    I don't know that there was anything in writing.
24 Typically, returns go against sales.
25   Q.    And when you say "typically," how do you know

1  that?
2     A.  Well, that's usually how it's done within the
3  industry.  I mean, it's kind of an industry norm.
4     Q.  How is that conveyed to sales representatives of
5  Power Medical when you were managing Mr. Tantiado?
6     A.  I'm not sure if it was in the compensation
7  booklet or not.  I don't know that the issue -- I don't
8  know that we directly discussed the issue.  So if it was
9  stipulated in a policy, it would be most likely in that
10 sales compensation booklet that comes out at the beginning
11 of the year.
12    Q.  Do you have any specific recollection of a
13 writing or a written policy stating that policy?
14    A.  No, I can't recall if it was in the compensation
15 communication or not.
16    Q.  And did you ever inform Mr. Tantiado that there
17 was a policy that returns would be counted against sales?
18    A.  I don't recall having -- I don't recall
19 specifically communicating that.
20    Q.  How about to any other sales representative?
21    A.  No.
22    Q.  Since you resigned from Power Medical, have you
23 had any discussions with anyone at Power Medical regarding
24 Mr. Tantiado?
25    A.  I had a conversation with Keith Mintun.  I had

```
 1        A.   Through -- I mean, the first thing you look at
 2   are sales results.  So that's probably the primary gauge as
 3   to how somebody's doing.
 4        Q.   About how many products was your sales team
 5   trying to sell during the time that Myrick Tantiado was a
 6   salesperson under your supervision?
 7        A.   Well, there's different product lines.  So there
 8   was really three product lines:  straight linear cutters,
 9   right-angle linear cutters and circular staplers.
10        Q.   And under each line, about how many products were
11   there?
12        A.   There's typically three or four products, you
13   know, four products.
14        Q.   So would you say, in total, there is roughly 10
15   to 12 products that were being sold at any given time?
16        A.   Yeah.
17        Q.   So how much of an impact does it have on your
18   sales force if one particular product isn't selling well?
19        A.   You know, it can have an impact.  I mean, if you
20   don't sell one, then it can make it harder, but -- so I
21   don't know how to answer that, other than if you were to
22   take -- I suppose you could do it mathematically.  I'd say
23   it can have an impact.
24        Q.   Do you recall a Dr. Robert Khoo?
25        A.   Yes.
```

```
 1   Probably -- might have been after.
 2       Q.   Do you recall the contents of the e-mail?
 3       A.   Contents of the e-mail would have been sales
 4   objectives potentially, you know, discussions around sales
 5   objectives, the need to sell a certain volume of products
 6   monthly.
 7       Q.   Do you recall what quarter that would be based
 8   on?
 9       A.   May have been the second quarter, could have been
10   the third.  I'm not sure.
11       Q.   Did Mr. Tantiado respond to that e-mail?
12       A.   I don't recall.
13       Q.   Do you recall any other e-mails to Mr. Tantiado
14   regarding performance-related issues?
15       A.   Not during 2006.
16       Q.   Do you recall any specific conversations with
17   Mr. Tantiado between the date of the ASBS meeting and the
18   date of your meeting in Wisconsin?
19       A.   No.
20       Q.   Do you recall the date of the ASBS meeting?
21       A.   I want to say it was in the early part of May.
22       Q.   Do you recall the date of the Wisconsin meeting?
23       A.   July, maybe 6th, 7th and 8th, something like
24   that, but I'm not positive on that date.
25            MR. HENRY:  Okay.  That's all I have.  I am going
```