STEPHEN HENRY (State Bar # 142336)
2625 Alcatraz Avenue, No. 615
Berkeley, CA 94705
Telephone: (510) 989-1883
Facsimile: (510) 295-2516
shenry@henrylaw.com

MARK L. MOSLEY (State Bar # 136449)
MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 992-4342
Facsimile: (415) 362-2006
mmosley@meqlaw.com

Attorneys for Plaintiff MYRICK MR. TANTIADO

UNITED STATES DISTRICT COURT

FOR THE NORTHER DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYRICK MR. TANTIADO, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>POWER MEDICAL INTERVENTIONS, a Pennsylvania corporation, and DOES ONE through FIFTY, inclusive,<br><br>Defendants. | Case No. C 07-02874 CRB MED<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION<br><br>Original filing date: April 6, 2007<br>Removal date: June 1, 2007 |

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ....................1

II. STANDARDS APPLICABLE TO PMI'S MOTION FOR SUMMAY JUDGMENT ....................1

III. PMI'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE PMI FAILS TO SUPPORT ITS DEFENSE WITH ADMISSIBLE EVIDENCE....................2

IV. DISPUTED FACTS....................4

V. ARGUMENT....................5

A. Mr. Tantiado Has Stated A Cognizable Violation of Public Policy. ....................5

B. There Is A Question Of Fact Regarding Whether PMI's Termination of Mr. Tantiado Was A Result of Retaliatory Animus. ....................8

C. There Is A Question of Fact Whether Chase's Knowledge of Mr. Tantiado's Refusal To Sell The Defective Product Affected The Decision To Terminate Him....................9

D. Mr. Tantiado Has Identified An Admitted Labor Code Violation by PMI. ..........10

E. PMI Has Not Established Mr. Tantiado's lack of Entitlement to Reimbursement of Expenses....................12

VI. CONCLUSION....................12

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)........ 2, 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........ 2

*Barnhill v. Saunders*, 125 Cal. App. 3d 1 (1981)........ 10

*Braxton-Secret v. A.H. Robins Co.*, 769 F2d 528 (9th Cir. 1985)........ 10

*Cabesuela v. Browning-Ferris Indus.*, 68 Cal.App.4th 101 (1998)........ 8

*California v. Campbell*, 138 F.3d 772 (9th Cir.1998)........ 2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........ 2

*CSEA v. State of California*,198 Cal. App. 3d 374 (1988)........ 10

*Fisher v. San Pedro*, 214 Cal. App. 3d 590 (1989)........ 9

*Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003)........ 8

*Gattuso v. Harte-Hanks Shopper*, 42 Cal. 4th 554, 575 (2007)........ 1, 11

*Green v. Ralee Engineering Co.*, 19 Cal. 4th 66 (1998)........ 1, 7, 8

*Harris v. Investor's Business Daily, Inc.* (2006) 138 Cal.App.4th 28........ 11

*Harris v. Itzhaki*, 183 F3d 1043 (9th Cir. 1999)........ 2

*Jhingan v. Roche Molecular Systems* (1996) 1996 WL 466577........ 8

*Koehl v. Viero*, 142 Cal. App. 4th 1313 (2006)........ 10

*Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F2d 872 (9th Cir. 1987)........ 9

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir.2000) (*en banc*)........ 2

*Mamou v. Trendwest Resorts Inc.*, 2008 WL 2908333 (2008)........ 8, 9

*Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007)........ 10

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000)........ 2

*Randone v. Appellate Dept.*, 5 Cal.3d 536 (1971)........ 10

*Sniaddach v. Family Finance*, 395 U.S. 337 (1969)........ 10

*Steinhabel v. Los Angeles Times*, 126 Cal. App. 4th 696 (2005) .......... 10, 11

*Stiesberg v. State of California*, 80 F.3d 353 (1996) .......... 7

*Tameny v. Atlantic Richfield Co*., 27 Cal.3d 167 (1980) .......... 1, 3, 8

*Triton Energy Corp. v. Square D Co*., 68 F.3d 1216 (9th Cir.1995) .......... 2

**Statutes**

21 U.S.C. § 331 .......... 7

21 U.S.C.A. § 201 .......... 6

21 U.S.C.A. § 351 .......... 6

Cal. Code Civ. Proc. § 487.020(c) .......... 10

Cal. Labor Code § 221 .......... 10

**Rules**

Fed. R. Civ. Proc., Rule 56(c) .......... 2

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Barely one week after plaintiff Myrick Mr. Tantiado told his immediate supervisor that he was no longer willing to sell an illegally non-conforming and dangerous medical product, his employer, defendant Power Medical Interventions ("PMI"), terminated him. PMI then refused to reimburse some of the out-of-pocket expenses that Mr. Tantiado had incurred for PMI's benefit. PMI now claims that it was free to terminate Mr. Tantiado because he did not identify a specific illegal act by PMI when he was employed. PMI also now claims that it had the right to recover commissions it had previously paid Mr. Tantiado for PMI products he sold many months earlier because the customers returned those products to PMI after Mr. Tantiado's departure.

While there are numerous disputed issues of material fact, not the least being the motive behind PMI's decision to terminate Mr. Tantiado, PMI also misstates the applicable legal standards.

PMI's first contention fails because the termination of an employee for refusing to engage in an act that would violate a statute is a wrongful termination in violation of public policy (*Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 178 (1980)) even if the employee's communications regarding that refusal are communicated only to his employer. *Green v. Ralee Engineering Co.*, 19 Cal. 4th 66, 82 (1998). None of the cases discussed by PMI in its opening brief apply to the facts of this case.

PMI's second contention fails because California Labor Code section 2802 required PMI to "fully reimburse [Mr. Tantiado] for all expenses actually and necessarily incurred." *Gattuso v. Harte-Hanks Shopper*, 42 Cal. 4th 554, 575 (2007).

For the reasons discussed below, the Court should deny PMI's Motion for Partial Summary Judgment .

## II. STANDARDS APPLICABLE TO PMI'S MOTION FOR SUMMAY JUDGMENT

On a Motion for Summary Judgment, the party moving for summary judgment has both an initial burden of production of evidence and the ultimate burden of persuading the court that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. Proc., Rule 56(c); see *California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in the light most favorable to the nonmoving party. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (*en banc*).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1102-1103 (9th Cir. 2000).

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The inferences to be drawn, even from undisputed facts, may depend on the weight and credibility of the evidence and so are the province of the jury to decide. *Id.*; *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159 (1970). Further, issues of credibility and intent, as exist in this case, should be left to the jury to decide. *Harris v. Itzhaki*, 183 F3d 1043, 1051 (9th Cir. 1999).

PMI has failed to meet its burden.

## III. PMI'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE PMI FAILS TO SUPPORT ITS DEFENSE WITH ADMISSIBLE EVIDENCE.

PMI's most fundamental factual arguments are unsupported by admissible evidence and, for that reason alone, it cannot prevail on summary judgment.

1. As a quasi-factual proposition, PMI states that there is no "provision of law" which protects employees "who are uncomfortable with particular aspects of their job." That is impossible to disagree with as a general principle, but it only goes so far. California law *does* protect against retaliatory termination those who *refuse to engage in illegal activity*, such as the

sale of a defective, non-conforming, FDA regulated product. *Tameny v. Atlantic Richfield Co.* 27 Cal.3d 167, 178 (1980) ("We hold that an employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer.") In this case, as explained below, the Food Drug and Cosmetics Act expressly prohibits the sale of adulterated or non-conforming products.

2. PMI claims that Mr. Tantiado's case is fatally flawed because the person who made the decision to terminate him was unaware that he had complained about the defective, non-conforming nature of its product or that he had refused to sell the product. PMI claims, in its Memorandum of Points and Authorities, that the person who made the decision was Chief Executive Officer Michael Whitman. However, PMI offers no evidence supporting that "fact" and has previously provided contradictory evidence. Neither the Declaration of Michael Whitman nor any other evidence provided by PMI states that Mr. Whitman made the decision to terminate Mr. Tantiado. Mr. Whitman's belated Declaration (filed four days late) states: "*it was decided* that Mr. Tantiado would be terminated for his inability to meet the minimum requirements of his job," not that he, Michael Whitman, made that decision. In fact, even if Mr. Whitman had stated that he had made the decision to terminate Mr. Tantiado, that statement would be contradicted by PMI's initial responses to Special Interrogatories in which PMI stated that *John Roache* made the decision to terminate Mr. Tantiado.[1] *See* Declaration of Stephen Henry, Exhibit A (PMI's Supplemental Answers to Special Interrogatories, No. 4 ["PMI states

---

[1] While the excerpts of the Deposition of Robert Chase include testimony by Mr. Chase that Mr. Whitman instructed him to terminate Mr. Mr. Tantiado, there is no foundation for any knowledge on Mr. Chase's part that Mr. Whitman had made the original decision to terminate Mr. Mr. Tantiado, only that the decision was communicated to him by Mr. Whitman. Decl. of Duke, Exhibit B (Depo. of Chase at 42).

that John Roache, PMI's Vice President of Sales . . . made the decision to terminate Myrick Tantiado's employment with PMI."])

3. Whitman's declaration refers to "minimum requirements" of Mr. Tantiado's job and "PMI's practice" of terminating individuals who fail to meet those "minimum requirements." However, Mr. Whitman fails to provide any foundation for what the "minimum requirements" were or what "PMI's practice" is with respect to termination.

4. With respect to its defense of its conversion of Mr. Tantiado's unreimbursed out-of-pocket business expenses, PMI claims that there was industry practice with regard to compensation for "net sales" and that Mr. Tantiado was aware of PMI's interpretation of that industry practice. However, PMI's argument rest entirely upon the testimony of Robert Chase, who has not been established as an expert on industry practice, and on its bald assumption of Mr. Tantiado's supposed understanding of that industry practice – a practice which was never communicated or memorialized in any document provided to him or in any oral statement made to him by PMI. In fact, PMI contradicts its own position in its answer to Special Interrogatory No. 23, in which it identifies the purported sources of PMI's policy on offsetting unreimbursed out-of-pocket business expenses with returns. Declaration of Stephen Henry, Exhibit A (PMI's Supplemental Answers to Special Interrogatories, No. 23). PMI's Response to Interrogatory No. 23 does not refer to "industry practice" as a purported source of Mr. Tantiado's knowledge that his unreimbursed out-of-pocket business expenses could be offset by sales returns.

## IV. DISPUTED FACTS

Mr. Tantiado, an employee of PMI from July 1, 2004 to July 10, 2006, sold PMI's surgical stapling product, SurgAssist Computer Powered Stapling System. This system was implicated in a number of adverse surgical situations by doctors to whom Mr. Tantiado had sold it and Mr. Tantiado received numerous complaints from those doctors, which he then passed on to PMI. (Declaration of Myrick Tantiado, para. 3) Mr. Tantiado concluded that the product was defective. (Declaration of Myrick Tantiado, para. 4)

Mr. Tantiado's complaints regarding the integrity of the SurgAssist Computer Powered

Stapling System pertained specifically to the Circular Stapling line such as the Circular Stapling Unit, 25mm (CS25) and the Circular Stapling Unit, 29mm (CS29). These systems are regulated by the Food and Drug Administration. (*See* Request for Judicial Notice, Exhibit A, B and C.) They have been the subject of voluntary recalls by PMI, *id*., but defective lots remained in circulation. (Declaration of Stephen Henry, Exhibit B: Deposition of Mr. Tantiado, pages 106-110.) Knowing that PMI was not addressing the problem of defective, non-conforming product, Mr. Tantiado explained to his immediate superior, Rob Chase, that he would not sell the product. (Declaration of Mr. Tantiado, para. 4) During that discussion, Mr. Chase and Mr. Tantiado specifically discussed the possibility that PMI might fire Mr. Tantiado as a result of his decision. (*Id.*) This discussion occurred just one week before Mr. Tantiado's termination. (*Id.*)

These undisputed facts create an inference that PMI wrongfully terminated Mr. Tantiado for complaining about the dangerous misuse of PMI's surgical stapling product in an effort to silence his concerns, to eliminate a salesperson who would not foist the defective, non-conforming product on unsuspecting customers, and to send a message to other PMI sales representatives that they should not even discuss any concerns they might have about the safety of PMI's products.

In addition, when PMI terminated Mr. Tantiado, it failed to pay him for his accrued but unreimbursed out-of-pocket expenses. Mr. Tantiado incurred these expenses in connection with performing his job responsibilities for PMI. Instead of reimbursing them as it had promised, PMI purported to offset against them certain amounts it claimed he owed the company for sales commissions it had already paid to him for products the customer returned to the company after his departure.

## V. ARGUMENT

### A. Mr. Tantiado Has Stated A Cognizable Violation of Public Policy.

Prior to his termination, Mr. Tantiado held a good faith belief that PMI produced a defective product. As a regulatory matter, a defective product is an adulterated, or non-conforming, medical device in violation of the Food and Drug Act.

A medical device is "an instrument, apparatus, implement, machine, contrivance,

implant, in vitro reagent, or other similar article that is intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment or prevention of disease." 21 U.S.C.A. § 201.

An adulterated product is defined in 21 U.S.C.A. § 351, in part, as:

> Sec. 351. Adulterated drugs and devices
>
> A drug or device shall be deemed to be adulterated. . .
>
> * * *
>
> (e) Devices not in conformity with performance standards
>
> (1) If it is, or purports to be or is represented as, a device which is subject to a performance standard established under section 360d of this title unless such device is in all respects in conformity with such standard.
>
> (2) If it is declared to be, purports to be, or is represented as, a device that is in conformity with any standard recognized under section 360d(c) of this title unless such device is in all respects in conformity with such standard.

This is the very definition of the SurgAssist device that Mr. Tantiado was being asked to sell and refused, warning that it was not performing as intended or as marketed to perform. Mr. Tantiado's actions supported a fundamental public policy against the continued introduction of defective medical products into the market.

In failing to heed Mr. Tantiado's warnings about the non-conforming nature of the product, PMI violated 21 U.S.C.A. § 351(e) and related FDA regulations including 21 CFR 803 and 21 CFR 820 *et seq.* pertaining to quality assurance of medical devices which are nonconforming or otherwise do not operate in their intended manner. A company producing a regulated device must maintain a quality assurance program which allows identification of defective devices and prevention of the release of defective devices.

Further, in addition to informing PMI of instances of failure of the product to conform to specifications, Mr. Tantiado also refused to continue to sell it, thereby complying with the Food, Drug and Cosmetics Act. The Food, Drug, and Cosmetic Act (FD&C Act) prohibits, among other things:

* The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded" [FD&C Act, sec. 301(a); 21 U.S.C. 331(a)].

* The adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce" [FD&C Act, sec. 301(b); 21 U.S.C. 331(b)].

* The receipt in interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise"[FD&C Act, sec. 301(c); 21 U.S.C. 331(c)].

In refusing to sell what he believed to be a defective product, Mr. Tantiado was resisting his employer's demand that he (1) introduce or deliver into interstate commerce an adulterated device or (2) participate in the receipt of an adulterated device into interstate commerce.

PMI's attacks on Mr. Tantiado's claim fall short. PMI claims that it "is impossible to violate a definition." PMI's Memorandum at 11. However, the definition in question describes products which are precluded from being sold (21 U.S.C. § 331), exactly what Mr. Tantiado refused to do. Further, PMI notes that Mr. Tantiado never told anyone that PMI was violating particular provisions. Mr. Tantiado is not an attorney and didn't have to know exactly what statutory provision was being violated; he conveyed that there were defects in the product which made it dangerous to use Declaration of Mr. Tantiado, para. 3 and 4, and knew that it was wrong to sell non-conforming products. Declaration of Duke, Exhibit A (Mr. Tantiado's deposition) at 96, 187. Likewise, while Mr. Tantiado did not know the precise statutes violated by PMI, he knew that it was wrong to sell a defective, non-conforming and dangerous medical instrument and he ultimately refused to do so. *Id*; Declaration of Mr. Tantiado, para. 3 and 4; *see Green v. Ralee Engineering Co.*, 19 Cal. 4th 66, 85 (1998) ("By informing defendant that he believed it was shipping defective parts for use in passenger aircraft, plaintiff gave defendant adequate notice that his concern involved potentially significant public policy matters because the FAA requires manufacturers to establish quality control procedures for the component parts they produce.")

*Stiesberg v. State of California*, 80 F.3d 353 (1996), relied on by PMI, is inapposite. In *Stiesberg*, plaintiff's claim failed solely because he had not directly reported wrongful conduct,

as the statute upon which he based his claim required. *Id* at 358. Here, Mr. Tantiado *did* directly convey his refusal to sell a defective, non-conforming product to his superior, supporting the public policy of not placing such products in commerce, and was wrongfully terminated for doing so.

PMI's reliance on *Jhingan v. Roche Molecular Systems* 1996 WL 466577 (1996), is equally misplaced. In *Jhingan*, the plaintiff had not reported her concerns to a governmental agency as required by the sole statute upon which she relied to support her public policy claim. *Id*. at 3. Mr. Tantiado was under no such duty. He simply refused to violate the law.

In *Green, supra*, the plaintiff complained internally to management about regulatory violations, was terminated, and was permitted to pursue a cause of action for wrongful termination in violation of public policy based on the fundamental public policy interest. "Therefore, this regulation-based fundamental public policy may serve as the foundation for plaintiff's Tameny claim …it furthers important safety policies affecting the public at large and does not merely serve either the employee's or employer's personal or proprietary interest. *Id.* at 82; *see also Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003); *Cabesuela v. Browning-Ferris Indus*., 68 Cal.App.4th 101, 109 (1998). Mr. Tantiado's claim falls squarely within the framework for a wrongful termination in violation of public policy established by the *Green* court. He complained internally about the devices' defects, ultimately refused to sell the defective devices, and was terminated one week later. PMI's arguments regarding Mr. Tantiado's lack of a public policy claim fail. Therefore, the Court should deny PMI's attempt at partial summary judgment on Mr. Tantiado's wrongful termination claim.

**B. There Is A Question Of Fact Regarding Whether PMI's Termination of Mr. Tantiado Was A Result of Retaliatory Animus.**

PMI argues that it terminated Mr. Tantiado for performance reasons and then asserts that he cannot prove otherwise by showing that the performance reasons were pretext for retaliatory animus. As Mr. Tantiado's claim is a state law claim for retaliation, the California Court of Appeal decision in *Mamou v. Trendwest Resorts Inc.*, 2008 WL 2908333 (2008) (attached to this Memorandum as Exhibit A) is on point. As clarified by the *Mamou*, "while 'pretext' is certainly

a relevant issue . . . the central issue . . .[is] whether the evidence as a whole supports a *reasoned inference* that the challenged action was the product of retaliatory animus." *Id.* at 17 (emphasis added). At the summary judgment stage, the Court's duty is to determine whether the employee's evidence "is *too weak* to sustain a reasoned inference in the employee's favor." *Id.* (emphasis by court). If reasonable competing inferences may be drawn from the facts, summary judgment should be denied. *Adickes v. S.H. Kress & Co., supra,* 398 US at 157; *Lake Nacimiento Ranch Co. v. San Luis Obispo County,* 841 F2d 872, 875 (9th Cir. 1987).

In this case, while a jury could draw a reasoned inference that the very close proximity in time between Mr. Tantiado's refusal to sell a defective, non-conforming product and his termination was coincidental, the jury could also draw a reasoned inference that the proximity between the two acts was evidence enough of retaliatory animus. *Fisher v. San Pedro,* 214 Cal. App. 3d 590, 615 (1989) (one may infer retaliation by the "proximity in time between protected activity and the allegedly retaliatory employment decision.")

This is particularly true given PMI's post-termination conduct, which lends credence to a retaliatory animus exhibited by seizing a portion of a fired employee's out-of-pocket expenditures made for the benefit of PMI – i.e., kicking him when he was down. Further evidence supporting a jury's reasoned inference of retaliatory animus is PMI's guilty knowledge of the subject product's defective and non-conforming nature. *See* Declaration of Stephen Henry, Exhibit B (Deposition of Mr. Tantiado at pages 107-111 [describing communications with Michael Whitman's right hand man regarding defective lot numbers]). Therefore, the Court should deny PMI's attempt at partial summary judgment on Mr. Tantiado's wrongful termination claim.

### C. There Is A Question of Fact Whether Chase's Knowledge of Mr. Tantiado's Refusal To Sell The Defective Product Affected The Decision To Terminate Him.

As discussed above, there is insufficient admissible evidence provided by PMI to prove that Michael Whitman was the sole decision maker regarding Mr. Tantiado's termination or that the decision maker(s) were not influenced by Chase's knowledge that Mr. Tantiado was refusing to sell a defective product. There is evidence to support the jury's reasoned inference, based on

evidence supporting retaliatory animus such as the proximity in time between the protected activity and the adverse employment action, that Mr. Chase's knowledge did affect the decision. *See Metoyer v. Chassman*, 504 F.3d 919, 938 (9th Cir. 2007) (retaliatory animus on the part of a person participating with the claimed decision maker can create question of fact as to animus held by claimed decision maker). A decision maker's state of mind, including motive, may be inferred from his or her conduct. But summary judgment should be denied where conflicting inferences can be drawn from such conduct. *See Braxton-Secret v. A.H. Robins Co.*, 769 F2d 528, 531 (9th Cir. 1985). In this case, such conflicting inferences exist and it is the role of the trier of fact to determine whether PMI is being truthful about the identity of the decision maker and the true motive of the actual decision maker. Therefore, PMI's attempt at partial summary judgment on Mr. Tantiado's wrongful termination claim should be denied.

**D. Mr. Tantiado Has Identified An Admitted Labor Code Violation by PMI.**

Labor Code section 2802 requires an employer to indemnify an employee for all expenditures that the employee incurs during the course of performing his or her duties.

An employer is precluded from unilaterally recovering unliquidated sums from employees by failing to pay those employees amounts previously agreed to be owed, *see Barnhill v. Saunders*, 125 Cal. App. 3d 1 (1981), and may not collect wages previously paid. Labor Code § 221. This is consistent with the longstanding rules against wage garnishment without due process. *See Sniaddach v. Family Finance*, 395 U.S. 337 (1969), *Randone v. Appellate Dept.*, 5 Cal.3d 536, 540 (1971), *CSEA v. State of California*,198 Cal. App. 3d 374, 378 (1988) and Code Civ. Proc. § 487.020(c).

Both *Steinhabel v. Los Angeles Times*, 126 Cal. App. 4th 696 (2005), and *Koehl v. Viero*, 142 Cal. App. 4th 1313 (2006), relied on by PMI, are inapposite to the issue of setting off commission returns *against out-of-pocket reimbursable expenses*. Both of those cases pertained to chargebacks against advanced commissions (i.e. the employer's money) rather than chargebacks against out-of-pocket reimbursable expenses (i.e. the employee's money). Therefore, neither *Steinhabel* or *Koehl* provide PMI with any legal justification for retaining some of the money that Mr. Tantiado expended to sell products for the company. Indeed, PMI

ignores the holding in *Harris v. Investor's Business Daily, Inc.* (2006) 138 Cal.App.4th 28 which specifically distinguished *Steinhabel.* The *Harris* court acknowledged that an employee could agree to a commission charge-back policy *in writing*, but held that if there was no explicit chargeback policy identifying commissions as advances as opposed to earned wages, the existence of a chargeback policy created a question of fact pertaining to a violation of the California Labor Code proscription on recovery of paid wages by an employer. *Id.* at 41. Here, PMI has failed to show any explicit chargeback policy in writing that would meet the requirement. PMI relies solely on the purported existence of an amorphous industry practice pertaining to "net sales." At best, PMI has shown the existence of material questions of fact regarding the existence of any identifiable policy or industry practice. In fact, as discussed below, PMI has proven its own violation of Labor Code section 2802.

*Gattuso v. Harte-Hanks Shopper*, 42 Cal. 4th 554 (2007), cited by PMI in support of its contention that an employer may withhold reimbursement of expenses as part of an established commission payment plan, is equally unavailing because the holding in *Gattuso* was premised on certain requirements being met, none of which were met in Mr. Tantiado's case. *Gattuso* held that a lump sum method of reimbursement of certain expenses was allowable under Labor Code section 2802 "provided that the amount paid is sufficient to provide *full reimbursement* for actual expenses necessarily incurred (*id.* at 570) and must identify the method the method or calculation to distinguish between commissions and expense reimbursement. PMI has done neither. As it concedes in its Brief, the only way Mr. Tantiado purportedly knew what rules applied to expense reimbursement reductions for product returns was through non-specific industry norms that were not communicated by PMI. More to the point, any scheme that reduces the reimbursement of expenses as a result of product returns *by definition* fails to "fully reimburse the employee for all expenses actually and necessarily incurred." *Id.* at 575. Indeed, based on the standard set by the California Supreme Court, because PMI admits that it paid Mr. Tantiado less than the full reimbursement, it admits that it violated Section 2802.

Therefore, the Court should deny PMI's attempt at partial summary judgment on Mr. Tantiado's California Labor Code claim.

**E. PMI Has Not Established Mr. Tantiado's lack of Entitlement to Reimbursement of Expenses.**

In a particularly disturbing and cynical argument, PMI asserts that, because one of the products it was asking Mr. Tantiado to sell was illegally defective, Mr. Tantiado is not entitled to reimbursement of the expenses he incurred trying to sell that product and other products for PMI. However, PMI provides no evidence that Mr. Tantiado had come to the conclusion that he was engaging in any illegal sale of defective products at the time that he incurred the unreimbursed expenses. In fact, given the extremely short nexus in time between Mr. Tantiado's statement to Mr. Chase that he would not sell the harmful stapler line and his termination, it is unlikely that he incurred any such expenses within that week. Moreover, Mr. Tantiado could have incurred all of these expenses trying to sell PMI's *safe* products. In short, since PMI has provided the Court with no evidence one way or the other on either of these issues, it cannot prevail on this argument at the summary judgment stage.

## VI. CONCLUSION

For the reasons stated above, Plaintiff respectfully asks the Court to deny PMI's Motion for Partial Summary Judgment in its entirety.

Dated: August 15, 2008

By: /s/ Mark L. Mosley
MARK L. MOSLEY
STEPHEN F. HENRY
Attorneys for Plaintiff